**NATIONAL LABOR RELATIONS BOARD, Petitioner/Cross–Respondent,**

v.

**GREAT SCOT, INC., Respondent/Cross–Petitioner.**

Nos. 93–5142, 93–5179.

United States Court of Appeals, Sixth Circuit.

Argued May 3, 1994.

Decided Nov. 14, 1994.

Fred L. Cornnell, Jr. (argued and briefed), N.L.R.B., Office of the Gen. Counsel, Washington, DC, Frederick Calatrello, Director, N.L.R.B., Cleveland, OH, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard (briefed), N.L.R.B., Washington, DC, for N.L.R.B.

G. Roger King (argued and briefed), Steven T. Catlett, Christopher J. Skorina, Jeffrey S. Sutton, Jones, Day, Reavis & Pogue, Columbus, OH, for Great Scot, Inc.

Before: MARTIN, NORRIS, and DAUGHTREY, Circuit Judges.

DAUGHTREY, Circuit Judge.

This case comes to us on petition by the National Labor Relations Board for enforcement of its order finding that the respondent, Great Scot, Inc., committed unfair labor practices in three respects and ordering the company to cease and desist. Great Scot has filed a cross-petition for review of the order. We conclude that the cross-petition has merit, and we therefore decline to issue an order of enforcement.

Central to an understanding of this appeal is the fact that the union activity at issue apparently involved "area standards" picketing and handbilling only, and not organizational or recognitional picketing. Because this activity was carried on by non-employees, the case falls under the general rubric of the Supreme Court's decision in *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), as that case was most recently construed in *Lechmere, Inc. v. NLRB,* 502 U.S. 527, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992). For the reasons given below, we conclude that the record fails to establish that the picketing in this case was protected activity under § 7 of the National Labor Relations Act and, therefore, we do not reach the question of whether the company violated § 8(a)(1) of the Act by engaging in one or more unfair labor practices against

the union in an attempt to suppress that picketing.

## I.

Great Scot, Inc. operates three supermarkets in northern Ohio. At two of the stores (located in Findlay and Fremont), the employees are represented by Local 954 of the United Food and Commercial Workers Union. The employees at the third store, in Port Clinton, are not represented by any labor organization. The Port Clinton store competes with three other supermarkets in a town of approximately 7,000 people. Local 954 represents the employees at two of the three competitor stores.

The Great Scot store in Port Clinton is located in a small shopping center shared by Great Scot and the Goodyear Tire Company. There is one designated entrance to an unfenced 100–car parking lot in front of the store and a single entrance into the store itself. On Friday, October 28, 1988, two representatives from Local 954 began picketing at the entrance to the parking lot, on the public easement. Two others distributed handbills near the entrance to the store. The picket signs, the handbills, and the aprons worn by the union agents all conveyed a "Don't Shop Here" message. The signs, for example, read: *"Notice to the Public*—Don't Shop [at Great Scot]. The store pays its employees wages and fringe benefits which are far below those paid to Unionized Grocery Store Employees in the area. This Company is attempting to destroy our higher Union Standards." The wording of the handbills was similar and directed shoppers to Port Clinton's two unionized supermarkets, Kroger and Foodtown.

The union agents picketed all afternoon on Friday, October 28, and returned to the Great Scot store the next day. That day, Saturday, October 29, the store manager asked the agents distributing handbills at the entrance to the store to leave the premises and, when they refused, he called the police and asked the officers who responded to his call to order union agents to leave Great Scot's property. The officers conveyed the message to the handbillers as requested, but they also told the manager that Great Scot would have to obtain a court order to have the picketers removed.

As a result, Great Scot filed a civil trespass action against the union in state court on November 2, 1988. The state court issued a temporary restraining order prohibiting Local 954 from trespassing on Great Scot's property, limiting the number of demonstrators to four, and restricting union activity to the public easement bordering the premises (where picketers did, in fact, continue to demonstrate on several successive weekends in November 1988 and sporadically thereafter). The union moved to dismiss the temporary restraining order on preemption grounds, and when the state court rejected the preemption argument, they filed an unfair labor practice charge with the National Labor Relations Board, contending that Great Scot had illegally interfered with the union's efforts to picket and distribute handbills. The Board's General Counsel issued a complaint and notice of hearing charging that Great Scot had committed three unfair labor practices: (1) by requesting the union agents to refrain from distributing handbills on its property; (2) by summoning police to request union agents to leave the premises; and (3) by filing a trespass action in state court seeking injunctive relief against the union.

At the ensuing hearing before an administrative law judge, there was little dispute concerning the facts surrounding the union's activity. There was, however, a minor controversy about the purpose of that activity. A union representative testified that its picketing was designed merely to inform the public of Great Scot's substandard wages and benefits and to dissuade the public from shopping there. The company argued that this claim was a pretext for some secondary objective, without specifying what that objective might be. Regardless of the union's motive,[1] what was *not* clearly established at

---

1. There is no substantial dispute in this case concerning the character of the union's conduct, unlike those instances in which a union claims that its picketing is informational only (and therefore not regulated by § 8(b)(7) of the NLRA), and the employer claims that the union's

the hearing was the actual disparity, if one existed, between Great Scot's wages and benefits and those of the other three supermarkets in the area, specifically the two unionized stores in Port Clinton.

David Sadowski, the staff organizer for Local 954, testified about the procedure usually followed by the union to determine what wages and benefits were being offered by a non-unionized employer being targeted for area-standards picketing, as follows:

We have a standard policy and procedure in that prior to going on any site, we use several methods to ascertain this. The methods that were used in this case involved a telephone interview and an application for employment with discussion of wages and benefits, et cetera.

Sadowski himself had not gathered any information directly from Great Scot, however, but was relying on information supplied to him at some unspecified point in the past by his predecessor in office, a man named Jack Sylvester. Sadowski stated repeatedly that he was unaware of what wages and benefits Great Scot was offering at the time the decision was made to initiate picketing against Great Scot and that in making that decision, he relied on the conclusion of others that Great Scot's pay scale was "sub-standard." The following exchange is typical of the responses given by Sadowski when questioned about the union's basis for picketing Great Scot:

Q: At the time you began that activity in late October of 1988, did you know the wages, benefits, and working conditions of the Great Scot Port Clinton store?

A: Only as related to me by Mr. Sylvester [who said] that they did not meet the other wage and area standards in the area.

Q: But in terms of knowing the specifics of those wages, benefits, and working conditions, you did not know what they were?

A: No, I did not personally, no.

Q: And it's your testimony that you began this picketing and handbilling activity based only on representations made to you that they were sub-standard in some fashion?

A: The representations were made to me based on the information given to me by Jack Sylvester, who had something like 25 years with the organization.

David Sadowski produced no area-standards documentation at the hearing, and no other witnesses were called who could have supplied the requisite information.[2]

Counsel for the company argued before the administrative law judge that the record contained "no evidence that Great Scot's Port Clinton wage and benefits are substandard ... [and] also no evidence establishing a uniform area standard against which Great Scot's wages and benefits can be compared." In response, the administrative law judge recognized, correctly, that "if the record showed that the wages and benefits received by the Great Scot employees were not 'substandard', then the Union's handbilling and picketing would not be protected by Section 7." But the judge also ruled, erroneously and without supporting authority, that "the burden of proof on this matter rests with the Respondent [Great Scot], not (as contended by the Respondent) with the General Counsel or the Union."

Explaining his ruling further, the judge said:

[I]t was up to the Respondent in order to support its contention that the Union's activity was unprotected by reason of the

---

activity is organizational or recognitional in nature (and therefore subject to the provisions in § 8(b)(7)). Here the question is posed in a different context, *i.e.*, a property owner's right to eject the union agents from its property because their activity does not fall within the ambit of protected activity under § 7.

**2.** General Counsel for the Board did call the chief operating officer of the Ohio division of

CWC Companies, which owned the Great Scot store in Port Clinton. He was not asked to bring evidence of Great Scot's pay scale, nor did Sadowski produce copies of union contracts with other stores in the area. The Port Clinton store's general manager, Ronald Rutkowski, testified on behalf of his employer, but he was not questioned about the store's pay scale.

untruth of the Union's area standards claim, to prove that the remuneration received by the store's employees was as high as that received by the employees of the unionized Foodtown and Kroger stores in Port Clinton. [Great Scot] made no such showing.

The administrative law judge then concluded that Great Scot had engaged in an unfair labor practice by "attempt[ing] to have the Port Clinton police remove the handbillers from [its] property," but held that it had not violated § 8(a)(1) of the Act in any other respect.

Despite the company's continuing contention that the union's activity was not protected under § 7 of the Act because the appropriate factual basis for area-standards picketing had not been demonstrated on the record, the Board made no finding on this issue. Instead, it affirmed the administrative law judge's determination that Great Scot's attempt to have the union handbillers removed by police constituted an unfair labor practice and held, further, that the company also violated § 8(a)(1) by asking the handbillers to leave the premises and by maintaining an action for trespass in state court past the date that the union's complaint was filed with the NLRB.

## II.

■ Before this court, Great Scot has renewed its argument that the union's activity was not protected under § 7 of the NLRA. After a careful study of the record, we conclude that their initial objection on this basis should have been sustained by the administrative law judge. And, while we routinely extend deference to the Board's findings, at least to the extent that they are supported by substantial evidence in the record as a whole, *Roadway Express, Inc. v. NLRB*, 831 F.2d 1285 (6th Cir.1987), we are not in a position to defer when the Board has made no finding at all on a dispositive issue such as the one now before us. As we noted in *Roadway Express*, "[i]f the Board errs in determining the proper legal standards, we may refuse enforcement on the grounds that the order has no 'reasonable basis in law.'" *Id.* at 1289 (quoting *Ford Motor Co. v.*

*NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979)). In this case, the Board evidently assumed—without ever deciding—that the union's activity was fully protected under § 7 of the Act.

## III.

■ The core activity protected by § 7 is the right of *employees* to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Hence, "[b]y its plain terms ... the [Act] confers rights only on *employees*, not on unions or their nonemployee organizers." *Lechmere*, 502 U.S. at ——, 112 S.Ct. at 845 (emphasis added). As a result, the Supreme Court has long recognized "a distinction between rules of law applicable to employees and those applicable to non-employees" and has characterized that distinction as "one of substance." *Babcock & Wilcox*, 351 U.S. at 113, 76 S.Ct. at 685. Because the "right of self-organization depends in some measure on the ability of employees to learn the advantages of self-organization from others," *id.*, non-employees do have a "derivative right" to engage in organizational activities. *Lechmere*, 502 U.S. at ——, 112 S.Ct. at 845.

■ Non-employee area-standards picketing is even farther removed from the core concerns of § 7. Not only were the picketers in this case *not* employees, but—even more significantly—their picketing was not even ostensibly aimed at organization. In other words, the targeted audience was not Great Scot's employees but its customers. Under the § 7 hierarchy of protected activity imposed by the Supreme Court, non-employee area-standards picketing warrants even *less* protection than non-employee organizational activity. *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 206 n. 42, 98 S.Ct. 1745, 1762 n. 42, 56 L.Ed.2d 209 (1978). *See also Sparks Nugget, Inc. v. NLRB*, 968 F.2d 991, 997–98 (9th Cir.1992).

■ Valid exceptions to the general rule of *Babcock & Wilcox*, allowing employers lawfully to exclude non-employee picketers from their property, will, according to *Lechmere*, occur only rarely. 502 U.S. 527, ——, 112 S.Ct. 841, 847 (citing *Sears*, 436 U.S. at 205, 98 S.Ct. at 1761). The exception recognized in *Babcock* was that non-employees picketing for organizational purposes must be accommodated on company property only where "the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them." 351 U.S. at 112, 76 S.Ct. at 684. The Supreme Court has, since *Babcock*, described the union's burden of establishing such isolation as "a heavy one," *Sears*, 436 U.S. at 205, 98 S.Ct. at 1761, and "one not satisfied by mere conjecture or the expression of doubts concerning the effectiveness of non-trespassory means of communication." *Lechmere*, 502 U.S. at ——, 112 S.Ct. at 849.

■ To support protected area-standards picketing, a right even more peripheral under § 7 than the organizational picketing involved in *Babcock* and *Lechmere*, the union has a similarly "heavy burden"—that of establishing that its claims of substandard wages and benefits are made in good faith[3] and are based on actual knowledge[4] gleaned from sufficient investigation[5] of conditions existing at the time the picketing is initiated against the targeted employer.[6]

The Board's failure to recognize such an obvious deficiency in this record is puzzling in view of its long-standing, oft-stated policy that:

> Area standards picketing can only be justified where, *in fact*, the picketed employer's mode of operation can be shown to be substandard in comparison with the negotiated area standards. This necessarily means that there must have been an investigation and an evaluation of comparative standards carried out with as great a degree of thoroughness as the circumstances will permit.

*Sales Delivery Drivers, Warehousemen and Helpers Local 296 and Food Employers*

---

3. The NLRB has held that "if a union is to be credited in its assertion that it is picketing solely for area standards, it must make reasonable efforts to obtain data upon which to base its evaluation that an employer does not meet area standards" and that those efforts must be made "in good faith." *San Francisco Local Joint Executive Board of Culinary Workers, and Robert Cassel*, 207 NLRB 199, 205 (1973). *See also NLRB v. Int'l Union of Operating Engineers, Local 571*, 624 F.2d 846, 849 (8th Cir.1980) (union's claim of area-standard picketing cannot be sustained where court "[finds] no evidence showing a bona fide attempt by Local 571 to determine if the Company was paying less than the area standards wage before beginning the[ir] picketing...."); *Carpenters Local Union No. 1622 and Paul E. Iacono Structural Engineers, Inc.*, 250 NLRB 416 (1980) (union's basis for picketing "cannot be characterized as 'a bona fide attempt' ... to determine that, in fact, the Employer's costs were substandard, which is the duty of a union that seeks to engage in lawful area standards picketing") (quoting *Automotive Employees, Laundry Drivers and Helpers, Local No. 88 and West Coast Cycle Supply Co.*, 208 NLRB 680 (1974)). *See also Red Food Stores, Inc. and United Food & Commercial Workers Int'l*, 296 NLRB 450, 457 (1989) (finding that "General Counsel did not demonstrate that the wages and benefits paid by Employer Red Food to its employees were below the standards in the area").

4. The NLRB has indicated that *double* hearsay, at least, is not competent evidence to establish

wages, benefits, and working conditions in an area-standards case. *See Service and Hosp. Employees Union Local 399 and Modern Maintenance Co., Inc.*, 206 NLRB 889, 890, 891 n. 10 (1973).

5. The standard set by the NLRB requires "an investigation and an evaluation of comparative standards carried out with as great a degree of thoroughness as circumstances will permit." *Sales Delivery Drivers, Warehousemen and Helpers Local 296 and Food Employers Council, Inc.*, 205 NLRB 462, 471 (1973), and case collected *infra* note 3. *See also Target Stores, Div. of Dayton–Hudson Corp. and Painter's Dist. Council No. 2*, 292 NLRB 933 (1989).

6. The record in this case fails to show when, in relation to the decision to picket, David Sadowski learned second-hand from Jack Sylvester that Great Scot's Port Clinton store was paying substandard wages and benefits. Nor does the record show how recently Sylvester had come to that conclusion. It is clear as a matter of law, however, that the information on which a union relies to justify area-standards picketing must not only be specific and accurate. It must also be recent. *Carpenters Local No. 1622, infra* n. 3 (second-hand information received a "year or so" before picketing was initiated held to be too "stale" to excuse the lack of investigation and evaluation of comparative wage standards).

Council, Inc., 205 NLRB 462, 471 (1973) (emphasis supplied), quoted in *Automotive Employees, Laundry Drivers and Helpers, Local No. 88 and West Coast Cycle Supply Co.,* 208 NLRB 679, 680 (1974); *Teamsters Local Union No. 115 and Herman Benn,* 224 NLRB 388, 391 (1976); *Int'l Brotherhood of Electrical Workers, Local Union No. 211 and Atlantic County Improvement Auth.,* 248 NLRB 168, 173 (1980); *Hoisting & Portable Local 101 and St. Louis Bridge Constr. Co.,* 297 NLRB 485 (1989). *See also NLRB v. Building and Construction Trades Council of Delaware,* 578 F.2d 55, 58 (3rd Cir. 1978) ("area standards picketing is permissible only where it can be shown that the employer's mode of operation is substandard in comparison with the negotiated area standards").

▬▬▬ Because it is "the *duty* of a union that seeks to engage in lawful area standards picketing" to investigate wages and conditions alleged to be substandard, *Automotive Employees,* 208 NLRB at 680 (emphasis added), the union has the burden of "coming forward with credible evidence" that establishes both the area standards and the claimed disparity. *Sales Delivery Drivers,* 205 NLRB at 473. In this case, the union wholly failed to offer proof sufficient to permit the administrative law judge to determine that Great Scot was properly subject to area-standards picketing. The only possible conclusion to be drawn, given the state of the record, is that the union's activity was not protected by § 7 of the NLRA and that Great Scot was within its rights to order union agents to leave the store's property and, when the picketers refused to leave, to request lawful assistance by the local police and the state courts in evicting the demonstrators.

Finding that the NLRB's order to Great Scot to cease and desist the alleged unfair labor practices charged by the union is not legally supportable, we refuse enforcement and VACATE the Board's order.