**UNITED FOOD AND COMMERCIAL WORKERS, AFL–CIO, LOCAL NO. 880, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 95–1123, 95–1260.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1995.

Decided Jan. 26, 1996.

Laurence S. Gold, Washington, DC, argued the cause, for petitioners with whom George R. Murphy, David M. Silberman, Virginia A. Seitz and Judith A. Scott were on the briefs. George Wiszynski and Peter J. Ford entered appearances.

Robert J. Englehart, Washington, DC, argued the cause, for respondent with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Margaret G. Neigus, Supervisory Attorney, were on the brief. Paul J. Spielberg, Deputy Assistant General Counsel, and Jill A. Griffin, Attorney, entered appearances.

Peter B. Kupelian, Southfield, MI, argued the cause and filed the brief, for intervenor Macomb Mall Associates, a limited partnership.

John S. Irving, Jr., Washington, DC, argued the cause for amicus curiae Chamber of Commerce of the United States et al., with whom Christopher Landau, Stephen A. Bokat, Mona C. Zeiberg and Hymen Bear were on the brief.

Harold R. Weinrich, Washington, DC, entered an appearance for intervenor Sears, Roebuck & Company.

Before: EDWARDS, Chief Judge, BUCKLEY and WILLIAMS, Circuit Judges.

HARRY T. EDWARDS, Chief Judge:

In *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 112–13, 76 S.Ct. 679, 684–85, 100 L.Ed. 975 (1956), the Supreme Court held "that an employer may validly post his property against nonemployee distribution of union literature," except when "the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them." For more than 35 years, the courts have consistently enforced *Babcock*'s mandate, holding that, as a general rule, section 7 of the National Labor Relations Act ("NLRA" or "Act")[1] does not give *nonem-* *ployee* union advocates the right of access to private property. In 1992, the Supreme Court, in *Lechmere, Inc. v. NLRB,* 502 U.S. 527, 538–39, 112 S.Ct. 841, 848–49, 117 L.Ed.2d 79 (1992), reaffirmed the general rule of *Babcock* and emphasized the narrowness of *Babcock*'s "inaccessibility exception."

In the instant cases, representatives and members of petitioner unions sought access to store-owned properties to distribute literature to the stores' would-be customers. In each instance, the unions were denied, or otherwise restricted, in their attempts to gain trespassory access to private property. Complaints were filed with the National Labor Relations Board ("NLRB" or "Board"). Applying the rationale of *Babcock*, the Board ruled that the owners were permitted to restrict access because petitioners failed to show that the customers were not reasonably accessible through nontrespassory means of communication.

The unions claim that the Board erred in applying the *Babcock* doctrine, arguing that *Babcock* and *Lechmere* involved union attempts to organize employees (a "derivative" exercise of the employees' section 7 right to self-organization),[2] whereas here the unions' attempted communications were directed at the stores' customers (an alleged direct exercise of the union members' right to engage in concerted activities for mutual aid or protection). The unions also seek review of the Board's decision requiring a union to show that mass media advertising is not a reasonably effective alternative for communicating the union's message in order to invoke the "inaccessibility exception."

We find no merit in petitioners' attempts to distinguish *Babcock* and *Lechmere*. Under the established case law, it would make no sense to hold that nonemployees have a

---

1. Section 7 provides that:
   Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....
   29 U.S.C. § 157 (1988). Section 8(a)(1) of the NLRA provides that "[i]t shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]." 29 U.S.C. § 158(a)(1) (1988).

2. *See* 29 U.S.C. § 157 (1988); *see also Lechmere,* 502 U.S. at 532–33, 112 S.Ct. at 845–46 (The Court observed that the NLRA, by its terms, directly confers rights only on employees, but that nonemployee organizers may, in some limited circumstances, "derivatively" exercise the section 7 rights of the employees they seek to organize.).

greater right of access when attempting to communicate with an employer's customers than when attempting to communicate with an employer's employees. Indeed, if anything, under Supreme Court jurisprudence, the hierarchy of rights under section 7 is just the opposite of what the unions assert: *Babcock* and its progeny indicate that, when it comes to balancing an employer's property rights against rights protected under section 7 of the NLRA, the interest of nonemployees in organizing an employer's employees is *stronger* than the interest of nonemployees engaging in protest or boycott activities directed at an employer's customers. The cases cited approvingly by the Court in *Lechmere* manifest this hierarchy. Furthermore, the Board's ruling regarding mass media advertising comports with the discussion in *Lechmere* regarding the narrowness of the inaccessibility exception. Although *Lechmere* itself involved organizational activity, we find no support for the suggestion by petitioners that the exception should be easier to satisfy in the context of nonorganizational activity. Accordingly, the petitions for review are denied.

## I. The Supreme Court's Decision in Lechmere

At bottom, the unions assert that, in construing *Lechmere* to apply to nonorganizational activity, the NLRB has impermissibly extended the reach of *Babcock*. According to petitioners, the issues here have yet to be addressed by the Supreme Court, and the Board erred in suggesting otherwise. The Board, on the other hand, found that whatever doubts existed under *Babcock* regarding the rights of nonemployee union advocates to gain access to an employer's private property were resolved by the Court's decision in *Lechmere*. We agree with the Board that, although *Lechmere* does not purport to decide the precise questions at hand in these cases, the Court's rationale in *Lechmere* disposes of the issues raised by petitioners. In fact, for us to rule otherwise would require a dismantling of the *Babcock* doctrine, something certainly not endorsed by the Court in *Lechmere*.

In *Lechmere*, the Court reversed an NLRB ruling that a retail store owner had violated the NLRA by barring nonemployee union organizers from entering its property to distribute union literature. The Board had based its ruling on a multi-factor balancing test set forth in *Jean Country*, 291 N.L.R.B. 11, 1988 WL 214053 (1988).[3] The Board deemed its balancing test applicable to "all access cases," 291 N.L.R.B. at 14, without regard for whether those seeking access were employees or nonemployees of the employer seeking to prevent access.

The Court found that, "[a]t least as applied to nonemployees, *Jean Country* impermissibly ... erod[ed] *Babcock*'s general rule that 'an employer may validly post his property against nonemployee distribution of union literature,'" a general rule that the *Lechmere* Court expressly reaffirmed. 502 U.S. at 538, 112 S.Ct. at 848 (quoting *Babcock*, 351 U.S. at 112, 76 S.Ct. at 684). The Court also took pains to reiterate *Babcock*'s observation "that the [NLRA] drew a distinction 'of substance' between the union activities of employees and nonemployees," *id.* at 537, 112 S.Ct. at 538 (citation omitted), and the Court repudiated any notion that subsequent cases had in any way altered *Babcock*'s central holding, *id.* at 534, 112 S.Ct. at 846. Thus, although "accommodation between employees' § 7 rights and employers' property rights 'must be obtained with as little destruction of one as is consistent with the maintenance of the other,'" *id.* at 534, 112 S.Ct. at 846 (quoting *Babcock*, 351 U.S. at 112, 76 S.Ct. at 684), the Court held in accordance with *Babcock* that "[i]t is *only* where [reasonable] access is infeasible that it becomes necessary and proper to take the accommodation inquiry to a ... level" where employees' and employers' rights are balanced, *id.* at 538, 112 S.Ct. at 848.

---

3. The Board in *Jean Country* stated:

[I]n all access cases our essential concern will be the degree of impairment of the Section 7 right if access should be denied, as it balances against the degree of impairment of the private property right if access should be granted. We view the consideration of the availability of reasonably effective alternative means as especially significant in this balancing process. 291 N.L.R.B. at 14.

In *Lechmere*, the Court also noted that section 7, "[b]y its plain terms ... confers rights only on *employees*, not on unions or their nonemployee organizers." 502 U.S. at 532, 112 S.Ct. at 845; *see also* 29 U.S.C. § 157. The Court observed, however, that employees' self-organization rights depend to some degree on the employees' ability to learn from others the advantages of self-organization, and that therefore section 7 "may, in certain limited circumstances, restrict an employer's right to exclude nonemployee union organizers from his property." 502 U.S. at 532, 112 S.Ct. at 845.

According to the Court, those "limited circumstances" are defined by the "limited scope" of the inaccessibility exception recognized in *Babcock* that applies "where 'unique obstacles' prevent[ ] nontrespassory methods of communication." *Id.* at 540, 535, 112 S.Ct. at 849–50, 847 (quoting *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 205–06 n. 41, 98 S.Ct. 1745, 1761–62 n. 41, 56 L.Ed.2d 209 (1978)). The Court explained that the exception "is a narrow one" and is not to be applied simply because nontrespassory access is "cumbersome or less-than-ideally effective," *id.* at 539, 112 S.Ct. at 840; rather, the exception is designed to protect communication-dependent section 7 rights when the target audience is "isolated from the ordinary flow of information that characterizes our society," and the "union's burden of establishing such isolation is ... 'a heavy one,' " *id.* at 540, 112 S.Ct. at 849 (quoting *Sears*, 436 U.S. at 205, 98 S.Ct. at 1761). Further, the Court noted that advertising may constitute "reasonably effective" communication that would render the inaccessibility exception unavailable. *Id.*

The core idea of *Lechmere* appears to be that, under section 7 of the NLRA, the private property interest of an employer is sacrosanct as against uninvited *nonemployees*, except in the narrow circumstance where the nonemployees are union organizers who have no other reasonable alternative means of communicating with the employer's employees. There is absolutely nothing in *Lechmere* (nor in the Court's decisions preceding it) suggesting that the rights of nonemployees are enhanced when access to private property is sought by nonemployees to communicate with the employer's *customers*, rather than the employer's employees.

With this background in mind, we turn to the cases here before us.

## II.  FACTS AND PROCEDURAL HISTORIES OF PETITIONERS' CASES

### A.  *Oakland Mall II*

In July 1988, Sears, Roebuck & Co. ("Sears") canceled a long-standing home delivery service contract with Ryder DPD ("Ryder"), and contracted instead with Leaseway Trucking. As a result of losing its contract with Sears, Ryder laid off about 100 drivers. In response, the International Brotherhood of Teamsters Local 243 ("Teamsters"), who represented Ryder's employees, prepared a handbill for the laid-off drivers to distribute to would-be customers of Sears, urging them not to patronize Sears until Sears once again contracted with Ryder.

On August 2, 1988, six laid-off Ryder drivers, accompanied by one union representative, began to distribute the handbill at two of the eight exterior entrances, and at the one mall entrance, to the Sears store at the Oakland Mall in Troy, Michigan. Each distribution location was on Sears' property. Similarly, on August 9 and 10, 1988, and again on September 7, 1988, the laid-off drivers sought to distribute the same handbill at four entrances to the Sears store in the Macomb Mall in Roseville, Michigan. Three of these entrances were on Sears' property, and one entrance was on mall property. The handbillers' activities were limited to distributing the handbill and asking customers to speak to Sears' management on behalf of the laid-off drivers; no signs were carried or displayed, and there was no picketing at either Sears store.

On each occasion, Sears and/or mall management forced those distributing handbills to leave the premises. While Sears flatly prohibited the handbilling on its property, Macomb Mall Associates ("Macomb Mall") sought to enforce its general, nondiscriminatory policy of requiring nontenant organizations wishing to engage in solicitation or petitioning on mall property to obtain, and to

name Macomb Mall as an additional insured under, a liability insurance policy covering bodily injury.

The Teamsters filed unfair labor practice charges against Sears and the two malls, alleging that exclusion of the handbillers from property owned by Sears and the malls violated section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1). The NLRB initially affirmed the determination of an Administrative Law Judge ("ALJ") that Sears and the malls had violated the Act. *See Oakland Mall, Ltd.,* 304 N.L.R.B. 832, 1991 WL 181863 (1991) (*"Oakland Mall I"*). Sears and Macomb Mall petitioned for review in this court, and the Board filed a cross-application for enforcement of its order. While the case was pending, the Supreme Court decided *Lechmere,* in light of which this court remanded the case for the Board's reconsideration.

On remand, the NLRB held that the *Babcock* analysis affirmed in *Lechmere* is applicable to nonemployee consumer boycott activities, such as the handbilling at issue in *Oakland Mall I. Oakland Mall, Ltd.,* 316 N.L.R.B. 1160, 1995 WL 220095 (1995) (*"Oakland Mall II"*). The Board "assume[d], without deciding, that the *Lechmere* analysis affords the possibility of an exception permitting access to private property for nonemployee consumer boycott activity if a union can prove that an employer's customers are not reasonably accessible by nontrespassory methods." *Id.* at 1163 n. 13. Thus, the NLRB turned to the question of whether the union had proven that it had no reasonable alternative means of communicating with Sears' customers. A majority of the Board ruled that, in light of *Lechmere,* which "emphasized the narrowness of the inaccessibility exception," it was "necessary to reconsider" and overrule Board precedent, such as *Jean Country,* that had held "that 'generally it will be the exceptional case where the use of newspapers, radio, and television will be feasible alternatives to direct contact.'" *Id.* at 1163 (quoting *Jean Country,* 291 N.L.R.B. at 13). Rather, the Board adopted a rule

whereby a union "must show that the use of the mass media . . . would not be a reasonable alternative means for the Union to communicate its message." *Id.*

The Board decided that the union in the present case had made no such showing; indeed, the Board found that the union did not consider the option of mass-media communication of its message to Sears' potential customers. *Id.* Thus, the Board majority ruled that the union had failed to carry its heavy burden of proving "unique obstacles" to the communication of its consumer boycott message to Sears' customers, and concluded that Sears and Macomb Mall did not act unlawfully in respectively prohibiting and imposing an insurance requirement on the union's handbilling on their properties.[4] *Id.* at 1164.

## B. *Loehmann's Plaza II*

In the second case under review, representatives of United Food and Commercial Workers Union Local No. 880, AFL–CIO ("UFCW") directed both picketing and handbilling at the customers of Makro, Inc. ("Makro"), which operates a retail store in a strip mall owned by Loehmann's Plaza in Willoughby Hills, Ohio. The picket signs and leaflets implored customers not to shop at the Makro store because Makro's treatment of its non-union employees might jeopardize union-negotiated wage and benefit standards for retail employees in the area. This "area standards" activity was conducted by representatives of UFCW, union members who worked at stores other than Makro, and paid pickets including family and friends of union members and representatives.

Makro and the mall owner directed the picketers and handbillers to leave their positions at the entrances and exits of the Makro store. When they refused, Makro and the mall owner obtained a state-court injunction preventing more than certain numbers of picketers from taking up positions in front of Makro's store and the entrance to the parking lot, and restraining the parking-lot picketers from coming within 25 feet from the

---

4. On remand, the Board did not address the issue of whether Oakland Mall, Ltd. ("Oakland Mall") had violated the NLRA, because Oakland Mall did not file exceptions to the ALJ's finding that it violated the Act. *Oakland Mall II,* 316 N.L.R.B. at 1160 n. 7.

front of the building. The union, in turn, filed an unfair labor practice charge, alleging a violation of section 8(a)(1).

The Board initially ruled that Makro and the mall owner had acted unlawfully. *Makro, Inc.*, 305 N.L.R.B. 663, 1991 WL 251696 (1991) (*"Loehmann's Plaza I"*). However, petitions for review and for enforcement were filed before the Sixth Circuit, which remanded the case to the Board for reconsideration in light of *Lechmere.*

The NLRB reversed its initial decision, and instead decided to dismiss the union's complaint. *Makro, Inc.*, 316 N.L.R.B. 109, 1995 WL 35600 (1995) (*"Loehmann's Plaza II"*). As in *Oakland Mall II*, the Board majority applied the *Babcock* analysis affirmed in *Lechmere*, concluding that "the Union had a reasonable alternative for conveying its message" through picketing at the entrances to the shopping center. *Id.* at 113. And as in *Oakland Mall II*, the union seeks review of the Board's interpretation of *Lechmere* as requiring *Babcock* analysis in this case. However, "[n]o review is sought … of the Board's determination that, if *Babcock* applies, reasonable alternative means existed to communicate with Makro's potential customers." Brief for the Petitioners at 12 n. 2.

### III. APPLICATION OF THE BABCOCK RULE OUTSIDE THE ORGANIZATIONAL CONTEXT

■ At heart, this case is a simple one. *Babcock* establishes (and *Lechmere* reaffirms) a general rule under which an employer may deny access to nonemployees seeking to trespass on the employer's property. In the cases at hand, petitioners' activities involved the trespass of nonemployees onto employers' properties, in response to which the employers barred them access. No recognized right under section 7 has been shown to apply; therefore, the employers' actions were not unlawful under the NLRA. There should be no more to the matter than that. However, petitioners attempt to obfuscate this straightforward analysis by proffering artificial distinctions between the section 7 rights asserted in *Babcock* and *Lechmere*, and those being asserted here.

In particular, petitioners make much of the fact that *Lechmere* involved organizational section 7 activity, and argue that the Court's reasoning in that case does not apply to consumer boycott and "area standards" activities directed at an employer's customers. We decline to read *Lechmere* so narrowly. As the Board has observed, there is "no suggestion in the Court's opinion … that it focused on organizing activities for any reason other than that *Lechmere* was an organizing case, and that the Court was simply (and prudently) deciding the case before it." *Leslie Homes, Inc.*, 316 N.L.R.B. 123, 128, 1995 WL 35604, *pet. for review denied sub nom. Metropolitan Dist. Council of Phila. and Vicinity United Bhd. of Carpenters and Joiners of Am. v. NLRB*, 68 F.3d 71 (3d Cir.1995).

Moreover, *Lechmere* clearly does not purport to overrule, or even modify, prior Court precedent dealing with the tension between property rights and alleged section 7 rights. The precedent cited approvingly in *Lechmere* establishes that, if there are any rights at all to be asserted outside the organizational context, *Babcock* applies. *Compare Sears*, 436 U.S. at 204, 98 S.Ct. at 1761 (The Court observed "that *Babcock* extends to § 7 rights other than organizational activity, though the 'locus' of the 'accommodation of § 7 rights and private property rights … may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context.'" (quoting *Hudgens v. NLRB*, 424 U.S. 507, 522, 96 S.Ct. 1029, 1037–38, 47 L.Ed.2d 196 (1976))) *with Central Hardware Co. v. NLRB*, 407 U.S. 539, 544–45, 92 S.Ct. 2238, 2241–42, 33 L.Ed.2d 122 (1972) (The Court stated that "[t]he principle of *Babcock* is limited to [an] accommodation between organization rights and property rights. This principle requires a 'yielding' of property rights only in the context of an organization campaign…. In short, the principle of accommodation announced in *Babcock* is limited to labor organization campaigns, and the 'yielding' of property rights it may require is both temporary and minimal.").

Further, assuming, arguendo, that nonemployees have rights to assert in the nonorganizational context, it makes sense that the *Babcock* rule reaffirmed in *Lechmere* would apply with no less force in the context of area standards or consumer boycott activities. Supreme Court precedent clearly establishes that, as against the private property interest of an employer, union activities directed at consumers represent weaker interests under the NLRA than activities directed at organizing employees. A long history of cases manifests a hierarchy among section 7 rights, with organizational rights asserted by a particular employer's own employees being the strongest, the interest of nonemployees in organizing an employer's employees being somewhat weaker, and the interest of uninvited visitors in undertaking area standards activity, or otherwise attempting to communicate with an employer's customers, being weaker still.[5] Thus, "[u]nder the § 7 hierarchy of protected activity imposed by the Supreme Court," nonemployee activity in which "the targeted audience was not [an employer's] employees but its customers" "warrants even *less* protection than non-employee organizational activity." *NLRB v. Great Scot, Inc.*, 39 F.3d 678, 682 (6th Cir.1994).

Therefore, given that "nonemployee organizational trespassing ha[s] generally been prohibited except where 'unique obstacles' prevented nontrespassory methods of communication," *Lechmere*, 502 U.S. at 535, 112 S.Ct. at 847 (quoting *Sears*, 436 U.S. at 205–06 n. 41, 98 S.Ct. at 1761–62 n. 41), it follows *a fortiori* that nonemployee trespassing for purposes of asserting *weaker* section 7 interests will be prohibited in the absence of "unique obstacles" triggering the inaccessibility exception. Moreover, "the balance struck ... under the *Babcock* accommodation principle has rarely been in favor of trespassory organizational activity," so "[e]ven on the assumption that picketing to enforce area standards is entitled to the same deference in the *Babcock* accommodation analysis as organizational solicitation, it would be unprotected in most instances." *Sears*, 436 U.S. at 205–06, 98 S.Ct. at 1762 (footnote omitted).

Finally, the distinction urged by petitioners between derivative and nonderivative section 7 rights is unsupported by the case law. The alleged distinction can be traced back to *Babcock*, where the Court observed that the strength of nonemployee organizers' interest in access to an employer's property flows from, and is limited by, the degree to which the target employees' right of self-organization depends on their "ability ... to learn the advantages of self-organization from others." 351 U.S. at 113, 76 S.Ct. at 685. However, *Babcock* 's discussion of the derivative nature of the section 7 rights exercised by nonemployee organizers does not focus on derivativeness for its own sake, but rather as a means of addressing the broader, essential

---

**5.** *Compare Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945) (The Court approved the Board's determination that an employer barring its employees from distributing union literature on its property generally places an unreasonable impediment on the freedom of communication essential to the exercise of its employees' right to self-organization.) *and Babcock*, 351 U.S. at 113, 76 S.Ct. at 685 (Where the Board had concluded that it was necessary to allow nonemployee union organizers to distribute union literature on an employer's property, the Court affirmed the vitality of *Republic Aviation* 's holding as to restrictions imposed by an employer on its *employees*, but chided the Board for "fail[ing] to make a distinction between rules of law applicable to employees and those applicable to nonemployees.") *with Sears*, 436 U.S. at 206 n. 42, 98 S.Ct. at 1762 n. 42 ("[S]everal factors make the argument for protection of trespassory area-standards picketing as a category of conduct less compelling than that for trespassory organizational solicitation.... [T]he right to organize is at the very core of the purpose for which the NLRA was enacted.... [whereas] [a]rea-standards picketing ... has only recently been recognized as a § 7 right.") *and Central Hardware*, 407 U.S. at 545, 92 S.Ct. at 2242 ("[T]he principle of accommodation announced in *Babcock* is limited to labor organization campaigns, and the 'yielding' of property rights it may require is both temporary and minimal."). *See also NLRB v. Great Scot, Inc.*, 39 F.3d 678, 682 (6th Cir.1994) (Upon reviewing Supreme Court law, the Sixth Circuit observed that *employee* organizational rights are at the "core" of section 7's ambit of protection, that, even within the context of organizational activities, there is a distinction between the rights afforded employees and nonemployees, and that "[n]on-employee area-standards picketing is even farther removed from the core concerns of § 7.").

issue: the degree to which trespass is necessary to exercise section 7 rights.[6] There is no assertion in *Babcock* that derivatively exercised section 7 rights are inherently weaker than rights based on activities by nonemployees who have no organizational purpose, and *Lechmere*'s parenthetical reference to "derivatively" exercised section 7 rights in recounting *Babcock*'s analysis does not purport to expand on *Babcock*'s reasoning. *See Lechmere*, 502 U.S. at 532, 112 S.Ct. at 845. Indeed, the so-called "derivative" rights obviously are stronger than those lacking a connection to the employees, for, as noted in *Sears*, "the right to organize is at the very core of the purpose for which the NLRA was enacted ... [whereas] [a]rea standards picketing ... has only recently been recognized as a § 7 right." 436 U.S. at 206 n. 42, 98 S.Ct. at 1762 n. 42. We find, as have the other circuits that have considered the issue, that *Lechmere* does not create a distinction between the strengths of derivative and nonderivative section 7 rights.[7]

In effect, the Court in *Babcock* made a once-and-for-all determination that, in the absence of an inaccessibility showing, the locus of accommodation for cases involving trespass by nonemployee union adherents will always fall in the range favoring denial of access, and *Lechmere* reaffirmed that determination.[8] And although *Babcock* and *Lechmere* were organizational cases, the reasoning therein is equally applicable in any situation where the exercise of a section 7 right requires communication of a message to a target group. *Cf. Sparks Nugget, Inc. v. NLRB*, 968 F.2d 991, 997–98 (9th Cir. 1992) (The Ninth Circuit interpreted *Lechmere* as requiring application of the basic rule allowing an employer to prevent nonemployee trespass, not only in cases of organizational communication directed at an employer's employees, but also in cases where "the pickets and handbills [a]re aimed at the general public."). In all such target-audience situations, *Babcock* and *Lechmere* indicate that the degree to which the exercise of the asserted section 7 right *depends on* trespassory access to an employer's property— *i.e.,* the degree to which the target audience is otherwise inaccessible—should be the critical consideration in the accommodation analysis; and the locus of accommodation should always fall in the denial-of-access range if there has been no showing that the target audience is not reasonably reachable through nontrespassory means of communication. The Board did not err in applying this analysis in the present cases.

### IV. THE INACCESSIBILITY EXCEPTION

■ In light of our conclusion that *Babcock,* as reaffirmed in *Lechmere,* applies to the present cases, there is no reason to think that *Lechmere*'s emphasis on the narrowness

---

**6.** The *Babcock* Court observed that, because employees' exercise of their section 7 right of self-organization depends on communication with organizers, the organizers' interest in trespassory access to an employer's property becomes paramount when such access is the only reasonably available means of communicating with the employees about organizing; and in that situation, "the employer must allow the union to approach his employees on his property." *See* 351 U.S. at 113, 76 S.Ct. at 685.

**7.** For example, in *Metropolitan Dist. Council of Phila. and Vicinity United Bhd. of Carpenters and Joiners of Am. v. NLRB*, 68 F.3d 71 (3d Cir.1995), the court denied review in a case in which the petitioner union asserted essentially the same derivative/nonderivative rights argument presented by petitioners here. The Third Circuit rejected the derivative/nonderivative rights distinction, finding no reason why the property-right-favoring accommodation reached in *Lechmere* "would be any less compelling in a case in which a union was engaged in area standards handbilling than

in a case where the union was engaged in direct organizational activity." 68 F.3d at 74–75. See also *NLRB v. Great Scot, Inc.,* where the Sixth Circuit cited *Lechmere* for the proposition that "non-employees do have a 'derivative right' to engage in organizational activities," but clearly identified consumer-targeted activity in direct exercise of section 7 rights as being *lower* on the section 7 totem pole than nonemployee organizational activity, despite the latter's derivative nature. 39 F.3d at 682.

**8.** *See Lechmere,* 502 U.S. at 538, 112 S.Ct. at 848 ("To say that our cases require accommodation between employees' and employers' rights is a true but incomplete statement, for the cases also go far in establishing the *locus* of that accommodation where nonemployee organizing is at issue.... It is *only* where ... access [to employees] is infeasible that it becomes necessary and proper to take the accommodation inquiry to a second level, balancing the employees' and employers' rights....").

of the inaccessibility exception to the general rule should not be fully applicable as well. Indeed, given that the organizational activity at issue in *Lechmere* itself appears to represent a stronger section 7 interest than the area standards and consumer boycott activities at issue here, it would be perverse to find that the threshold for the inaccessibility exception should be lower in this case than in *Lechmere*.[9]

In addition, the Board's statement in *Jean Country* that "generally it will be the exceptional case where the use of [forms of the mass media] will be feasible alternatives to direct contact," 291 N.L.R.B. at 13, is clearly at odds with *Lechmere*'s discussion of the inaccessibility exception. Although the Court in *Lechmere* declined to address the Board's specific finding that the union's local newspaper advertising was not reasonably effective in that case,[10] the Court did note that advertising may constitute "reasonably effective" communication for purposes of the inaccessibility exception, and stressed that the heavy burden of establishing inaccessibility rests solely on the union. *Lechmere*, 502 U.S. at 540, 112 S.Ct. at 849–50. Further, the Court declared that the union's burden is "not satisfied by mere conjecture or the expression of doubts concerning the effectiveness of nontrespassory means of communication;" rather, the union must show that the target audience is "isolated from the ordinary flow of information that characterizes our society." *Id.*

The Court's discussion clearly does not countenance a rule that assumes the ineffectiveness of paid mass media advertising and obviates the need for the union to meet its burden of establishing that "unique obstacles" render the target audience isolated from nontrespassory methods of communication. Thus, in *Oakland Mall II*, the Board

properly reconsidered its discussion of mass media communication in *Jean Country*, and violated no right of petitioner's when it adopted a rule that comports with *Lechmere* by requiring a "show[ing] that the use of the mass media ... would not be a reasonable alternative means for the Union to communicate its message." *See Oakland Mall II*, 316 N.L.R.B. at 1163.

## V. CONCLUSION

For the reasons set forth above, the petitions for review are denied.

*So ordered.*

---

9. In *Sparks Nugget*, the Ninth Circuit went further by finding that the inaccessibility exception does not apply *at all* in situations where customers, and not employees, are the target audience; alternatively, the court stated that, even if the exception were applicable, *Lechmere* would require a finding that the intended audience is presumptively not inaccessible "because the targets of the union protest do not reside on the employer's property." 968 F.2d at 997–98 (internal quotation and alteration omitted).

10. The Court found no occasion to address the merits of the Board's conclusion that the local newspaper advertising used by the union organizers was not reasonably effective, because the Court found that "other alternative means of communication were readily available" to the union. 502 U.S. at 540, 112 S.Ct. at 849–50.