**CLEVELAND REAL ESTATE PARTNERS, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 95–5534, 95–5737.

United States Court of Appeals, Sixth Circuit.

Argued May 20, 1996.

Decided Sept. 13, 1996.

Maynard A. Buck (argued and briefed),
Amy C. Strauss, Benesch, Friedlander, Co-

plan & Aronoff, Cleveland, OH, for Petitioner/Cross–Respondent.

Aileen A. Armstrong, Deputy Asso. Gen. Counsel, Appellate Court Branch, Corinna L. Metcalf (argued), Margaret Gaines Neigus (briefed), National Labor Relations Board, Washington, DC, for Respondent/Cross–Petitioner.

Before: RYAN and NORRIS, Circuit Judges; JOINER, District Judge.*

RYAN, Circuit Judge.

Petitioner Cleveland Real Estate Partners (CREP) appeals from an order of the National Labor Relations Board finding that it had engaged in unfair labor practices in violation of section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), when it prevented employees of the United Food and Commercial Workers Union Local No. 880 from distributing handbills on its property, a privately owned shopping center. The NLRB adopted the decision of the Administrative Law Judge ordering CREP to cease and desist interfering with the exercise of the handbillers' section 7 rights. The Board cross petitions, seeking enforcement of its order. For the reasons that follow, CREP's petition for review is GRANTED and the NLRB's petition for enforcement of its order is DENIED.

## I.

CREP is a general partnership engaged in the business of property management, and managed a strip mall in Mayfield Heights, Ohio, known as Eastgate Plaza at the time of the handbilling. The owner of the mall, Eastgate Associates, contracted with CREP in January 1992 to "supply all services pertaining to [the] management and operation" of the mall. John Maglosky, an employee of CREP, was Eastgate Plaza's property manager.

When CREP took over the management of the mall there were several signs posted on the property stating that "no solicitors [were] allowed." There was one sign posted in a grassy area between the sidewalk and the mall parking lot. Another sign was posted facing the main road coming into the mall. A third sign was posted in "the southernmost of the four driveways" coming into the mall. The ALJ credited the testimony of a union employee who participated in the handbilling who said he saw no signs.

In June 1993, the union started a handbilling campaign against a retail store called Marc's, a tenant at the mall, because it employed non-union workers. The union ordered the printing of two different handbills. One handbill illustrated a cartoon-like picture of worms in raisin boxes (the "raisin handbill"), and alleged that in September 1991, as a result of a complaint by a customer whose children became ill after eating raisins bought at Marc's, the local board of health had found live and dead meal moths in four of six boxes of raisins found on the shelves of Marc's. The handbill additionally stated: "Marc's employees will probably not tell anyone about their Company selling food that is not fit for human consumption, because they have no union to protect them." The handbill urged customers not to patronize Marc's, but to shop at stores that employed union workers who "make sure the products you buy are fresh and wholesome."

The second handbill (the "kids handbill") alleged that Marc's had violated child labor laws. The handbill pictured several children either crying or working and stated that a United States Department of Labor investigation revealed that Marc's had violated child labor laws "more than 2000 times." The handbill also stated, "The kids who work at Marc's undoubtedly do not protest when asked to work long hours or operate dangerous equipment because they have no union to fight for them while protecting their jobs." As with the raisin handbill, the kids handbill asked customers to shop at "union" stores, and listed several stores in the mall that employed union workers that were in the same business as Marc's.

* The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation.

The union appointed John Madzelonka, a union organizer, to be in charge of setting up the handbilling at Eastgate Plaza. Madzelonka began the distribution of the raisin handbill on June 26, 1993, and the kids handbill on July 23, 1993. The union distributed the handbills from 10 a.m. until 8 p.m. on weekdays, and from 10 a.m. until 6 p.m. on Sundays. The number of handbillers varied between two and seven at any given time. A total of 30 people participated in the handbilling, of whom all but approximately three were "rank-and-file" union members who worked for unionized stores. The purpose of the handbilling was "to tell the public that Marc's was a nonunion store, and to ask the public to shop at union stores in the area."

Two days after the handbilling began, George McAdoo, CREP's maintenance person, received a call from a Marc's manager complaining about the handbillers. McAdoo then asked the handbillers to leave the property because handbilling was not allowed at the mall. McAdoo confronted one of the handbillers, who informed him that the union was indeed permitted to distribute information on the mall premises. Although McAdoo testified that he instructed the handbillers to leave "five or six times a day," "quite a few times ... at least 10 times," and "a hundred times ... continually," the ALJ discredited his testimony as not believable and found that the only time McAdoo approached the union members was immediately after his conversation with the Marc's manager. The ALJ also rejected McAdoo's testimony that he told the handbillers that there were "No solicitation" signs throughout the property. Union members testified that McAdoo had never approached them to inform them about the signs. Madzelonka, who was present throughout most of the handbilling period, testified that no one ever approached him to complain about the union's distribution of the leaflets.

Two weeks after the Marc's manager contacted McAdoo, he contacted Maglosky, the property manager, to ask whether there was anything he could do to stop the handbillers. At approximately the same time, two mall customers complained about being "harassed" by the handbillers. The ALJ found that Maglosky did not follow up on these complaints and that no other persons complained. As a result of the call from the Marc's manager and the two customer complaints, Maglosky called one of Eastgate Associates' partners, James Rogers, to inquire about what to do. Rogers and Maglosky contacted an attorney and sometime before July 21, 1993, Rogers asked Maglosky to instruct the handbillers to leave the property. Maglosky then approached the handbillers and told them to leave as they were not permitted to handbill. The union members refused to leave.

On the same day, McAdoo posted several signs throughout the plaza which, citing a city ordinance, stated that parking was limited to two hours. Once this sign was posted, the union members moved their cars every two hours. Sometime thereafter, McAdoo also removed the three "No soliciting" signs that were posted throughout the property and installed six new "No solicitors" signs at each of the six driveways that connected the plaza with the main roads.

When the handbillers refused to leave the mall premises, Maglosky sent a letter to the president of the union stating:

> Due to numerous requests/complaints from tenants and patrons at [Eastgate Shopping Center], we are asking that you direct your representatives to cease handing out the flyers in front of the Marc's store, or anywhere else on the private property of the shopping center.

The union's attorney responded by letter stating:

> Please be assured that Local 880 is not interested in generating complaints from tenants or patrons of the Eastgate Shopping Center. Local 880 has made every effort to insure that the handbilling is done peacefully, professionally, safely, and without blocking ingress or egress. Accordingly we are surprised that you have received complaints.
>
> We want to address your concerns. Please call me so that we may set up a meeting with representatives of Eastgate and representatives of Local 880 to work out a mutually acceptable solution to the concerns which have been raised.

Maglosky responded to this letter warning that if the handbilling did not stop, he would call the police and have the union members escorted from the property. And indeed, on July 28, 1993, Maglosky contacted the police department and asked that the handbillers be removed from mall property because he believed they were violating a local ordinance. The police came to the mall and requested that the handbillers leave because they were in violation of an ordinance that prohibited loitering. The police gave the union members a copy of the ordinance, and after telephoning the union, the handbillers left.

The ALJ found that there were no allegations "that the handbillers ever acted in other than an orderly manner, blocked customers, or interfered with automobile or pedestrian traffic." The ALJ also found that the handbills contained no inaccurate or false statements, and that aside from the two calls from Marc's and the two customer complaints, no other person or business complained about the handbilling.

Maglosky testified that prior to the union handbilling, he had prevented two other attempts at solicitation: a Salvation Army donation pot, and the distribution of a restaurant leaflet placed on the windshields of parked cars. However, the ALJ found that the Salvation Army had solicited donations at the mall in previous years and was not asked to leave. A mall employee testified that several other businesses had solicited in the past; that political candidates had solicited signatures; and that Girl Scouts had sold cookies. These solicitors were not asked to leave the premises. The ALJ found that the other groups that solicited at the mall during 1992 and 1993 without being asked to cease and desist were: the Knights of Columbus; a mayoral candidate; the Boy Scouts; veterans; and school children selling candy to benefit various school projects. Maglosky testified that he had no knowledge of any of these activities. The ALJ further found that during the handbilling period, other groups solicited donations and sold raffle tickets outside of the Marc's store, but were not asked to leave.

The ALJ concluded that "by excluding the union handbillers, while casually, haphazardly, and lackadaisically policing with respect to other solicitation/distribution activity...,[CREP] discriminated against the union handbilling within the meaning of *[NLRB v.] Babcock & Wilcox Co.* 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956)]". The ALJ found that the union members were engaged in "protected activity" as that term is understood under section 7 of the Act, as many of the handbillers were in the active employ of unionized mall stores. Finding that these union employees were asking customers to patronize their union store instead of Marc's, the ALJ concluded that they were "unquestionably" engaged in protected activity. The ALJ found immaterial the fact that the union was paying the handbillers a minimal sum to pass out flyers, and that they were not employed by Marc's. It concluded that

> the Board takes the position that handbilling by nonemployee union agents for the purpose of inducing customers to patronize unionized in preference to nonunionized stores does impact on employees' Section 7 rights, because such activities are conducted, at least in part, on behalf of employees of those unionized stores that customers were being asked to patronize.

(Citing *Great Scot, Inc.,* 309 N.L.R.B. 548, 1992 WL 355431 (1992), *vacated on other grounds,* 39 F.3d 678 (6th Cir.1994).)

Accordingly, the ALJ found that CREP had committed an unfair labor practice in violation of section 8(a)(1) when it had the handbillers removed from its property, and the NLRB adopted the ALJ's findings of fact and conclusions of law. CREP timely appeals the order and the NLRB timely seeks an enforcement of its order.

## II.

### A.

■ The issue we are required to decide is whether the owner of a private retail shopping mall may forbid union representatives from distributing handbills directed at shoppers to discourage them from patronizing a nonunion retailer in the mall, while permitting non-labor-related handbilling and

solicitations by others in the mall, without violating section 8(a)(1) of the NLRA. Our answer, on the facts of this case, is that it may.

The NLRB held that the handbilling in this case was "protected activity" under section 7 of the Act and that by excluding the handbilling by union representatives, but permitting solicitation and handbilling of various kinds by others such as the Girl Scouts, the Knights of Columbus, political candidates, and school children selling candy, the mall owner, through its managing agent, unlawfully discriminated against the union within the meaning of the rule announced in *N.L.R.B. v. Babcock*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975.

■ Since the NLRB's decision turned on the finding that CREP was guilty of "discrimination," and since the meaning of "discrimination" under *Babcock* is a legal issue, we review that part of the Board's conclusion *de novo*. However, we review the Board's factual application and statutory construction under a substantial evidence standard, a deference that is warranted if the Board's conclusions are based upon a reasonably defensible construction of the Act. *Emery Realty, Inc. v. NLRB*, 863 F.2d 1259, 1263 (6th Cir.1988).

**B.**

■ CREP first argues that it did not violate section 8(a)(1) of the Act because the handbillers were not engaged in protected activity within the meaning of section 7. CREP suggests that because no employees of Marc's, the ultimate target of the union's activity, were involved in the handbilling, the handbilling was not therefore an organizational effort, and the union's activity was not protected under the Act.

If the union's handbilling was protected activity under section 7, it must be because the handbillers were so-called "statutory employees" engaged in "other mutual aid or protection" under the Act, as it is clear that they were not Marc's employees and were not engaged in a self-organizational activity. 29 U.S.C. § 157; *Eastex, Inc. v. NLRB*, 437 U.S. 556, 564, 98 S.Ct. 2505, 2511, 57 L.Ed.2d

428 (1978). Such union activity has been characterized as similar in many respects to so-called "area standards picketing", which this court has held to be protected activity under section 7. *Giant Food Markets, Inc. v. NLRB*, 633 F.2d 18, 23 (6th Cir.1980).

While we have some doubt whether the evidence in this case supports the Board's conclusion that the handbillers were engaged in section 7 protected activity, we need not decide the question because, assuming it was, we are satisfied that in forbidding the union's handbilling on mall premises, CREP did not commit an unfair labor practice.

**C.**

■ The NLRA does not expressly authorize the exercise of section 7 rights that entail trespassing on private property. The general rule is that the owner of private property, including a retail shopping plaza open to the public, need not, except under very limited circumstances, permit the distribution of union literature on its property. *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 538, 112 S.Ct. 841, 848, 117 L.Ed.2d 79 (1992). *Lechmere* must be understood, however, in light of the Supreme Court's earlier decision in *Babcock*.

In *Babcock*, nonemployee union organizers were refused permission to distribute organizational literature to company employees on the employer's company-owned parking lots. The employer argued that it "maintained a consistent policy of refusing access to all kinds of pamphleteering and that such distribution of leaflets would litter its property." *Babcock*, 351 U.S. at 107, 76 S.Ct. at 681. The union argued that the location of the *Babcock* plant and the layout of adjacent highways and driveways were such that it was unreasonably difficult for the union organizers to reach the employees off company property. The NLRB agreed with the union's argument and held that because of that difficulty, the employer, in refusing to permit the handbilling on company property, had unreasonably interfered with the employees' right to self-organization in violation of the Act. The Supreme Court disagreed and de-

clared that the "Board failed to make a distinction between rules of law applicable to employees and those applicable to nonemployees." *Id.* at 113, 76 S.Ct. at 684.

The Court stated:

[A]n employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution....

. . . .

[W]hen the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize.

. . . .

The distinction [between employee and nonemployee pamphleteering] is one of substance. No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline. *But no such obligation is owed nonemployee organizers.*

*Babcock,* 351 U.S. at 112–13, 76 S.Ct. at 684 (emphasis added) (citation omitted).

*Lechmere* involved the distribution of union literature by nonemployee union organizers in the parking lot of a privately owned retail shopping plaza. Apparently Lechmere, Inc., a retail store, was the principal tenant in the shopping plaza which included thirteen other satellite stores. Lechmere and the developer of the shopping plaza were joint owners of the parking lot, but Lechmere was not an owner of the satellite stores in the plaza. When the nonemployee union organizers began placing handbills on the windshields of cars parked in the shopping plaza parking lot, Lechmere's managers confronted the handbillers and asked them to leave, advising them that handbill distribu-

tion and solicitation or handbill distribution of any kind was forbidden on the property. The handbillers left and in due course filed an unfair labor practice complaint against Lechmere for forbidding the distribution of the union literature.

After reviewing its holding in *Babcock,* the Supreme Court stated:

*Babcock*'s teaching is straightforward: § 7 simply does not protect nonemployee union organizers *except* in the rare case where "the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels[.]" . . . Where reasonable alternative means of access exist, § 7's guarantees do not authorize trespasses by nonemployee organizers, even . . . "under . . . reasonable regulations" established by the Board.

*Lechmere,* 502 U.S. at 537, 112 S.Ct. at 847–48 (quoting *Babcock,* 351 U.S. at 112, 76 S.Ct. at 684).

After reviewing the facts of the case, the *Lechmere* Court declared:

Because the union in this case failed to establish the existence of any "unique obstacles" that frustrated access to Lechmere's employees, the Board erred in concluding that Lechmere committed an unfair labor practice by barring the nonemployee organizers from its property.

*Id.* at 541, 112 S.Ct. at 850 (citation omitted).

Our inquiry begins where it began in *Babcock* and *Lechmere;* that is, with the recognition that there is a substantial difference between the rights of employees and of nonemployees with respect to the distribution of union literature on privately owned property. And, for purposes of this principle, there is no difference, of course, between property owned by the targeted nonunion employer and privately owned property of which the targeted employer is merely a coowner or even a lessee.

■ Although we may assume for the sake of decision that handbillers in this case were so-called "statutory employees," in that at least some of them were employees of other unionized stores, there is no question that they were nonemployees for purposes of ana-

lyzing the trespassory access at issue in this case. In *Sears, Roebuck & Co. v. San Diego Dist. Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), the Court clarified that *Babcock*'s reference to "employees" meant the targeted "employer's employees." *Id.* at 206 n. 42, 98 S.Ct. at 1762 n. 42. That is, trespassory area standards handbilling is protected only as "derivative of the right of *that* employer's employees to exercise their organization rights effectively." *Id.* (emphasis added). And informational handbilling by persons other than the target employer's own employees, especially when directed at consumers rather than at employees, simply has "no ... vital link" to the organizational rights of the targeted employer's own employees. *Id.* Thus, *Lechmere*'s reference to "nonemployee" union organizers necessarily includes the handbillers in this case, as none was an employee of Marc's. *See United Food & Commercial Workers, AFL–CIO, Local No. 880 v. NLRB*, 74 F.3d 292, 297–99 (D.C.Cir.1996), *petition for cert. filed*, No. 95–1760, 64 U.S.L.W. 3742 (U.S. April 25, 1996).

This definition of employee is not in conflict, nor is it inconsistent, with the definition of a "statutory" employee. The law does not treat employees in the same manner in every labor law context. *See NLRB v. Town & Country Elec., Inc.*, —— U.S. ——, ——, 116 S.Ct. 450, 457, 133 L.Ed.2d 371 (1995). Thus, although the handbillers' own employers cannot retaliate against them for assisting the union in the informational handbilling against Marc's, the NLRA does not grant the handbillers a correlative right to enter upon the Marc's premises, or the private property on which the Marc's leased premises is located, to communicate with the employees of Marc's, its customers, or the general public. That the handbilling is protected activity within the meaning of section 7 simply means that nonemployees, in the literal meaning of the word, must satisfy the standard set forth in *Babcock* and reaffirmed in *Lechmere* to gain trespassory access to exercise that right. *See United Food*, 74 F.3d at 299.

■ We hold, therefore, that the owner of private commercial premises may forbid handbilling by "nonemployee" union organiz-

ers engaged in nonorganizational, informational activity directed at the general public, unless the union is able to show that it is entitled to trespass on the owner's private property because the inaccessibility to the general public to which the handbilling is directed "'makes ineffective the reasonable attempts by nonemployees to communicate with [the public] through the usual channels.'" *Lechmere*, 502 U.S. at 537, 112 S.Ct. at 848 (quoting *Babcock*, 351 U.S. at 112, 76 S.Ct. at 684). *Babcock*'s exception to the rule of nonaccess is a "narrow one" and "does not apply wherever nontrespassory access ... may be cumbersome or less-than-ideally effective." *Id.* at 539, 112 S.Ct. at 849.

In this case, however, the Board argues that *Lechmere* does not apply at all because CREP "discriminated" against the union by permitting other solicitation. Under *Babcock*, according to the Board, no showing of inaccessibility need be made when an employer discriminates in the enforcement of its no-solicitation rule. The Board has consistently applied this interpretation of *Babcock*'s "discrimination" principle. As we stated earlier, the language of *Babcock* to which the Board has reference is:

> [A]n employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution.

*Babcock*, 351 U.S. at 112, 76 S.Ct. at 684.

The Board's understanding of *Babcock*'s discrimination principle is well-exemplified by *Be–Lo Stores*, 318 N.L.R.B. No. 1 (1995), where the Board held that the occasional presence of "Muslims selling oils and incense," "an 'occasional' Jehovah's Witness distribut[ing] the Watchtower magazine," and "on one occasion a local Lions Club solicit[ation]," demonstrated discriminatory enforcement of a no-solicitation rule when the employer denied access to a union. *Accord Dow Jones & Co.*, 318 N.L.R.B. No. 59 (1995). We think the Board has misinterpreted *Babcock*.

*Babcock* and its progeny, which weigh heavily in favor of private property rights, indicate that the Court could not have meant to give the word "discrimination" the import the Board has chosen to give to it. To discriminate in the enforcement of a no-solicitation policy cannot mean that an employer commits an unfair labor practice if it allows the Girl Scouts to sell cookies, but is shielded from the effect of the Act if it prohibits them from doing so. *Cf. Guardian Indus. Corp. v. NLRB,* 49 F.3d 317, 320–22 (7th Cir.1995). Although the Court has never clarified the meaning of the term, and we have found no published court of appeals cases addressing the significance of "discrimination" in this context, we hold that the term "discrimination" as used in *Babcock* means favoring one union over another, or allowing employer-related information while barring similar union-related information.

■ Although we are respectful of the Board's interpretation, we are not compelled to follow it when it rests on erroneous legal foundations. *See Lechmere,* 502 U.S. at 539, 112 S.Ct. at 849. No relevant labor policies are advanced by requiring employers to prohibit charitable solicitations in order to preserve the right to exclude nonemployee distribution of union literature when access to the target audience is otherwise available. The purpose of section 8(a)(1) is to prevent employers from interfering with employees' exercise of section 7 rights. An owner of private commercial property who permits a charitable organization to distribute information or conduct solicitations on its property simply does not implicate the policies of the NLRA and does not, without more, render an employer guilty of an unfair labor practice when later it chooses to follow the general rule of "validly post[ing its] property against nonemployee distribution of union literature." *Babcock,* 351 U.S. at 112, 76 S.Ct. at 684.

We hold that *Lechmere*'s access analysis applies to informational consumer handbilling and that *Babcock*'s "discrimination" principle does not nullify *Lechmere*'s application, but only addresses situations where an employer discriminates against the union in favor of other union or employer-related distribution.

Because the union in this case failed to meet its heavy burden of showing inaccessibility to the customer base of Marc's in order to establish the handbillers' limited entitlement to engage in trespassory informational handbilling, we hold that CREP did not violate section 8(a)(1) of the Act.

## III.

The petition for review is **GRANTED,** and the NLRB's request for enforcement of its order is **DENIED.**