*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0281P (6th Cir.)
File Name: 02a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ALBERTSON'S INC.,
               *Petitioner/*
*Cross-Respondent,*

    *v.*

NATIONAL LABOR RELATIONS
BOARD,
             *Respondent/*
*Cross-Petitioner,*

UNITED FOOD AND
COMMERCIAL WORKERS
UNION LOCAL 555,
             *Intervenor.*

Nos. 00-2359;
01-1002

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
Nos. 19-CA-24232; 36-CA-7702; 36-CA-7763.

Argued: June 20, 2002

Decided and Filed: August 20, 2002

Before:  CLAY and GILMAN, Circuit Judges; HAYNES,
District Judge.*

―――――――――――

**COUNSEL**

**ARGUED:**  Peter M. Anderson, PRESTON, GATES &
ELLIS, Seattle, Washington, for Petitioner.  John Arbab,
NATIONAL LABOR RELATIONS BOARD, Washington,
D.C., for Respondent.  Giles H. Gibson, GOLDBERG,
MECHANIC, STUART & GIBSON, Portland, Oregon, for
Intervenor. **ON BRIEF:** Peter M. Anderson, Patrick Michael
Madden, PRESTON, GATES & ELLIS, Seattle, Washington,
James E. Burke III, Rachael A. Rowe, KEATING,
MUETHING & KLEKAMP, Cincinnati, Ohio, for Petitioner.
John Arbab, Aileen A. Armstrong, Charles P. Donnelly, Jr.,
Julie Marcus, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for Respondent. Giles H. Gibson, Gene B.
Mechanic, GOLDBERG, MECHANIC, STUART &
GIBSON, Portland, Oregon, for Intervenor.  Wayne H.
Hoecker, LATHROP & GAGE L.C., Kansas City, Missouri,
Michael G. Dolan, CADWALADER, WICKERSHAM &
TAFT, New York, New York, Nelson D. Atkin II, BARRAN
LIEBMAN LLP, Portland, Oregon, for Amici Curiae.

―――――――――――

**OPINION**

―――――――――――

CLAY, Circuit Judge.  Albertson's Inc. ("Albertson's"), a
retail grocer, seeks review of a decision by the National Labor
Relations Board ("Board"), in which the Board held that
Albertson's committed an unfair labor practice against two
unions when Albertson's allowed charitable groups to solicit
on, in and around its property on various occasions, but

―――――――――――

*The Honorable William J. Haynes, Jr., United States District Judge
for the Middle District of Tennessee, sitting by designation.

denied non-employee union representatives the same right. The Board held that this practice violated Section 8(a)(1) of the National Labor Relations Act ("NLRA") in that Albertson's discriminated against the union solicitation. Albertson's contends that employers do not violate the NLRA by allowing charities to solicit on their property while denying the same right to unions under the circumstances present here. The Board, which cross petitions for enforcement of its order, contends on appeal that the authority relied on by Albertson's only applies in situations where the union is engaged in activity that would harm the employer, such as boycotting activity, and that one of the unions in the instant case was not engaged in such activity but rather in organizational activity. For the reasons that follow, we **DENY** enforcement of the Board's order and **GRANT** the petition for review by Albertson's.

## BACKGROUND

### Procedural History

On November 27, 1995, Driver Salesmen, Warehousemen, Food Handlers, Clerical and Industrial Production, Local 582, affiliated with International Brotherhood of Teamsters, AFL-CIO ("Local 582"), a union located in Spokane, Washington, filed an unfair labor practice charge against Albertson's in Case No. 19-CA-24232, alleging that Albertson's sought to remove representatives of the union from the front of its stores. Local 582 representatives had convened in front of Albertson's stores in order to distribute handbills asking customers not to purchase products of Broadview Dairy, a manufacturer with whom the union was on strike.

On December 4, 1995, a different union, United Food and Commercial Workers Union, Local 555, affiliated with United Food and Commercial Workers International Union, AFL-CIO ("Local 555") filed a charge against Albertson's in Case No. 36-CA-7702. The charge alleged that Albertson's had threatened Local 555 representatives with arrest and civil action for attempting to gain access to stores 580 and 581 in Clark County, Washington in order to obtain authorization

cards from employees. The union alleged that access should have been allowed pursuant to a Collective Bargaining Agreement ("CBA") between Local 555 and Albertson's covering all present and future stores in Clark County, Washington. On April 22, 1994, the union amended the charge to allege that Local 555 had been treated differently than other organizations which were allowed access to Albertson's stores.

On March 7, 1996, Local 555 filed a second charge against Albertson's, (36-CA-7763), alleging that Albertson's had refused to allow union representatives access to Albertson's stores in Oregon, also in order to obtain authorization cards from employees, which the union claimed was allowed under the CBA. Local 555 amended this charge on April 22, 1996, alleging that Albertson's had refused it access to its stores' premises while allowing such access to other organizations.

The Regional Director consolidated Case Nos. 36-CA-7702 and 36-CA-7763 on May 16, 1996. Subsequently, Case No. 19-CA-24232 was consolidated with the other two cases. The parties moved to transfer the matter to the Board, waive argument before an administrative law judge ("ALJ") and stipulate to the facts. The Board considered the matter for almost four years, and in a sharply divided decision, the Board majority found that Albertson's committed an unfair labor practice and violated the NLRA by excluding representatives of Local 582 and 555 from its stores.

Albertson's filed this timely notice of appeal on November 13, 2000. Although none of the actions complained of occurred in this circuit, jurisdiction is proper pursuant to 29 U.S.C. § 160(f), which provides that a party may seek review of a Board decision in the court of appeals in a judicial circuit where the party transacts business. Albertson's contends that it has well over 1,000 employees in Tennessee and Michigan and thus review by this Court is proper. The Board has cross-petitioned and seeks enforcement of its order.

before us in the instant case, we hold that the definition of discrimination provided in *CREP* and *Sandusky* controls.[6]

### CONCLUSION

For the foregoing reasons, we **DENY** enforcement of the Board's order and **GRANT** the petition for review by Albertson's.

---

[6] We also reject the Board's argument that our holdings in *CREP* and *Sandusky* regarding the term "discrimination" were merely dicta, as such an argument is belied by the language in those opinions. *See, e.g., CREP*, 95 F.3d at 465 ("[W]e *hold* that the term 'discrimination' as used in *Babcock* means favoring one union over another, or allowing employer-related information while barring similar union-related information.") (emphasis added).

We of course also are bound by this Court's holding in *Meijer*, but as we have explained, that case does not require that we reject the definition of discrimination as set forth in *Sandusky* and *CREP*. This Court has recognized that there is an hierarchy of rights under Section 7 of the NLRA. *NLRB v. Great Scot, Inc.*, 39 F.3d 678, 682-83 (6th Cir. 1994). While the core activity protected by Section 7 is the right of employees to self-organize, as previously stated, "non-employees have a 'derivative right' to engage in organizational activities." *Id*. Farthest removed from protection under Section 7 of the NLRA is the activity engaged in by the non-employees in *CREP* and *Sandusky*-- picketing activity. *See Great Scot*, 39 F.3d at 682 (explaining that non-employee picketing warrants even less protection than non-employee organizational activity). While non-employee organizers may warrant greater protection under the NLRA than non-employees who engage in non-organizational activity, both situations still implicate trespass activity. As this Court in *Meijer* noted, "trespass cases create a situation where the interests of the trespasser *are at their weakest*, and therefore, the property owner has a presumptive right to exclude non-employees from its property." 130 F.3d at 1213 (emphasis added). Thus, while "'an employer may not always bar non-employee union organizers from his property,'" the burden the union bears in showing that the employer may not do so is a "'heavy one . . . evidenced by the fact that the balance struck by the Board and the courts under the *Babcock* accommodation principle has rarely been in favor of trespass organizational activity.'" *Lechmere*, 502 U.S. at 535 (quoting *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180 (1978)). In contrast, where employees rights are at issue "no restriction on employees rights to self-organization is permissible unless the employer shows that such restriction is necessary to maintain order and discipline." *Lechmere*, 502 U.S. at 533. Because, among other things, the Court in *Meijer* addressed concerns regarding self-organizational rights of employees themselves and the rights that they are granted under the NLRA, the Court held that it was not bound by *CREP* and *Sandusky*. Because we do not have such considerations

## Facts

The facts are essentially undisputed inasmuch as the parties stipulated to them below. Albertson's has a formal written policy on access and solicitations, which applies to all stores, and which bans any and all solicitations.

## Local 582

Between November 1, 1995 and January 26, 1996, Local 582 engaged in an economic strike against Broadview Dairy, located in Spokane, Washington. Local 582 attempted to distribute handbills at six of Albertson's retail and grocery stores in the Spokane area. The handbills urged customers to refrain from buying Broadview Dairy products, which Albertson's sold, inasmuch as Broadview offered "wages and benefits far below the industry standards." The handbills also made clear that the union's dispute was not with Albertson's, but only with Broadview. None of the individuals who sought to disseminate the handbills were employees of Albertson's. Albertson's requested police assistance in order to remove handbillers from its property at several of the stores.

On various occasions while the handbillers attempted to pass out their handbills, Albertson's allowed other groups on its property to solicit donations. These included the Camp Fire Girls and Boys, Boy Scouts, Girl Scouts, and area schools. Further, the Salvation Army was allowed to ring bells during Thanksgiving and Christmas at the stores each year.

## Local 555

During May 1995 to February 1996, Albertson's also denied non-employee business representatives of Local 555 to the interior and immediate exterior of five of its stores located in Clark County, Washington (stores 580 and 581), Bend, Oregon (stores 587 and 588), and Redmond, Oregon (store 589). Local 555 representatives sought access to these

stores in order to solicit the company's employees to become members of and/or to request representation by Local 555.

In early July 1995, and on October 25, 1995, supervisors at stores 580 and/or 581 denied access to Local 555 representatives and told them to leave the premises.

Local 555 began its organizing campaign in April 1995, and as part of that campaign, representatives entered into stores to talk to employees and distribute literature, and placed literature on car windshields in the parking lot. On May 1, 1995, Albertson's notified Local 555 by letter that its conduct violated the store's no-solicitation policy. Local 555 representatives again attempted to distribute materials in July 1995 and were told to leave. In a July 13, 1995 letter, Albertson's again advised the union that its conduct violated the store's no-solicitation policy. Similar letters were sent to the union in November 1995 and February 1996 after Local 555 representatives had again attempted to distribute its materials and solicit members at some of the company's stores.

Local 555 already has a CBA with approximately 47 of the company's stores in Oregon and in two stores in Washington. At various times in the past, Albertson's apparently allowed Local 555 representatives or representatives of predecessor unions access to the interior or exterior of its new stores in order to inform employees about the union. According to the CBA, covering stores 587, 588, and 589, Local 555 was allowed store access to investigate the union standing of represented meat department employees. According to Local 555, the clauses in the CBA also provided that Albertson's agreed to recognize Local 555 as the representative of its non-exempt grocery employees in stores 587, 588, and 589 based upon a majority of the employees authorizing such representation, without having an NLRB election.[1]

---

[1] During oral argument, the Board expressly stated that Local 555 does not claim that Albertson's should have allowed the union access to its stores under any rights granted by the CBA. Rather, on appeal, the

instant case. This case implicates the presumptive right of Albertson's to exclude distribution of union literature on its property. Further, this case involves non-Albertson's employees seeking access to the company's property. Finally, no relevant labor policies are advanced in banning charitable solicitations in this case where there has been no claim that the target audience was otherwise inaccessible. The only factor that distinguishes this case from *CREP* or *Sandusky* is the fact that those cases involved non-organizational activity. The Board urges that we distinguish those cases from this one on that one ground. However, the Board has presented no reasoned basis to justify our doing so. In reaching its holding as to the meaning of the term "discrimination," the Court in *CREP* was interpreting that term as used in *Babcock & Wilcox*, and *Babcock & Wilcox* was an organizational case. *See Babcock & Wilcox*, 351 U.S. at 681 (explaining that the employer had refused to allow non-employee union organizers on company property to distribute union information targeted at company employees). Thus, the only basis on which to distinguish this case from *CREP* or *Sandusky* is that those cases involved non-organizational activity; yet in reaching the holding regarding discrimination, they were interpreting an organizational case. We believe under these circumstances, those cases cannot meaningfully be distinguished from the instant case, and we are therefore bound by their holdings. *See United States v. Humphrey*, 287 F.3d 422, 451-52 (6th Cir. 2002) (explaining that a panel is bound to follow precedential authority from another panel of this court unless such authority can be distinguished, even if current panel is inclined to disagree with prior decision); *Sandusky*, 242 F.3d at 692 (explaining that "firm, fixed rule" in this circuit is that one panel cannot overrule a prior panel's holding); *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 608 (6th Cir. 1996) (holding that although on their face two prior cases from different panels appear to contradict, the issue involved was heavily fact driven, and court would apply the holding of the one prior case with facts most analogous to the issue before the court).

distinguished *CREP* and explained that the panel in that case adopted a narrow definition of "discrimination" as a result of (1) the general rule that an owner of private property is under no obligation to permit the distribution of union literature on its property; (2) the substantial difference between the rights of employees and non-employees with respect to the distribution of union literature on privately owned property; and (3) the fact that *CREP* involved non-employee union representatives engaging in non-organizational activity. *Id*. at 1213. In addition, the Court in *Meijer* also noted that *CREP's* holding relied on a policy consideration not present in *Meijer*: "[T]he Court was . . . influenced by the fact that '*[n]o relevant labor policies are advanced by requiring employers to prohibit charitable solicitations in order to preserve the right to exclude non-employee distribution of union literature when access to the target audience is otherwise available*.'" *Id*. (emphasis added) (quoting *CREP*, 95 F.3d at 465).

The Court in *Meijer* distinguished the case before it for all the reasons noted above, and not, as the Board claims, solely because *CREP* involved non-organizational activity. Further, it is evident that the Court distinguished *Meijer primarily* because that case involved *Meijer's* employees. *See e.g., Meijer*, 130 F.3d at 1219 ("The majority believes that the *[CREP]* definition of discrimination should be not be applied in the instant case, since [the former case] involved non-employee solicitors and this case involves employees.") (Norris, J., dissenting). As the majority in *Meijer* pointed out, this distinction is one of substance. *Id*. at 1213 (noting that "[e]mployees are accorded greater protection under the Act than non-employees, but they [employees] are accorded even greater protection under the Act when they are engaged in organizational activity."); *see also Babcock*, 351 U.S. at 685 (explaining that the distinction between employee's right to discuss self-organizing and the right of non-employee organizers is one of "substance"); *CREP*, 95 F.3d at 463 (same).

Every factor except one that the Court in *Meijer* pointed to in order to distinguish that case from *CREP* is relevant to the

The Board points out that Albertson's has allowed charitable and/or civic/educational groups to solicit its customers in the areas immediately surrounding the entrance to the stores. For instance, during the Christmas season, all five stores allow Salvation Army bellringers to solicit the company's customers. Stores 580 and 581 have allowed the Girl Scouts, Boy Scouts, Brownies and youth and school groups to solicit its customers. Stores 587, 588 and 589 also have allowed the Girl Scouts, Campfire Groups, the Veterans of Foreign Wars, Disabled Veterans of America and youth and school groups to solicit.

Generally, these groups are allowed to set up in the area adjacent to the store entrances and exits. However, Albertson's admits that during inclement weather, it has permitted the Girl Scouts and Salvation Army bellringers access to the immediate interior of the store. The Clark County and Bend/Redmond Salvation Army bellringers solicit on store property throughout the month prior to Christmas. The Clark County Girl Scouts are granted access to store property twice a year, during a two-week period each time. Bend/Redmond area Girl Scouts are granted access to sell their cookies once a year, for sixteen continuous days. The Clark County Boy Scouts are granted access to store property to sell products twice a year, during one month in the fall and another month in the spring. The other groups are granted access to property one to three days during the course of the year. At each of the five stores, Albertson's has never allowed another labor organization to distribute literature, to handbill, or to solicit customers on the interior or exterior of the premises.

Albertson's has rejected requests to solicit donations by other organizations aside from the charitable groups mentioned above, such as political groups, charitable

---

Board contends that Albertson's should have permitted Local 555 access to its stores, despite Albertson's no-solicitation policy, because Albertson's allowed such access to charities.

organizations unfamiliar to the community, and all non-charities.

### DISCUSSION

### I.

Albertson's seeks review of the Board's decision and contends that Albertson's has a right to exclude from its property non-employee union representatives who engage in either non-organizing or organizing activities. According to Albertson's, the Board erred in finding that Albertson's discriminated against the union by allowing certain charitable groups to solicit on its property but denying the union such rights. Albertson's further contends that this finding by the Board conflicts with two opinions from this Court, *Sandusky Mall Co. v. NLRB,* 242 F.3d 682 (6th Cir. 2001), and *Cleveland Real Estate Partners ["CREP"] v. NLRB*, 95 F.3d 457 (6th Cir. 1996).

On appeal, the Board argues that Albertson's discriminated against Local 555 and violated Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), when Albertson's excluded union representatives from its stores. The Board contends that an employer violates the NLRA when it denies a union access to its premises for organizational purposes but allows charities to solicit donations on its property. It contends that an employer's tolerance of non-employee charitable solicitations is probative evidence of discrimination against non-employee organizing activity. It further argues that there is no basis for treating charities any differently than unions, contending that treating these two groups similarly avoids the temptation of labeling "employee" organizational activity harmful to an employer's business, while labeling charitable solicitation helpful or advantageous to business.

The Board also contends that this Court should defer to the Board's definition of "discrimination" because by defining that term, the Board was allegedly interpreting the NLRA, a responsibility entrusted to it by Congress. While the Board recognizes that this Court has narrowly defined the term

*Sandusky*, as the Board's decision did not expressly rely on any such distinctions in reaching its decision. A "reviewing court . . . must judge the propriety of [the actions of an administrative agency] solely on the grounds invoked by the agency." *NLRB v. United States Postal Serv.*, 833 F.2d 1195, 1201 (6th Cir. 1987) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). "A court will not affirm the administrative action by substituting a more adequate or proper basis . . . [and] [t]his Court will not affirm the Board's actions based on reasons not relied upon by the Board itself." *Id.* (rejecting Board's argument before this Court that the Board's reading of the Postal Reorganization Act was supported by a then recent Supreme Court case when case did not lend such support and Board failed to rely on that case to justify its reading of the Act in its decision below); *see also NLRB v. Kentucky River Cmty. Care Co.*, 532 U.S. 706, 715 n.1 (2001) ("We do not . . . substitute counsel's post hoc rationale for the reasoning supplied by the Board itself.") (quoting *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 685 n.22 (1947)). In any event, even if we were to consider the Board's arguments on appeal as to why this case is distinguishable from *CREP* and *Sandusky*, we do not believe that the arguments advanced withstand scrutiny.

The Board relies on *Meijer Inc. v. NLRB*, 130 F.3d 1209 (6th Cir. 1997), to support its contention that the holding regarding the term "discrimination" set forth in *CREP*, as that term was used in *Babcock & Wilcox*, is inapplicable to the instant case. In *Meijer*, the employer challenged a Board's order requiring Meijer, a food and general merchandise retailer, to allow employees at one of its stores to wear union insignia while on the job. *Id.* at 1210. The store manager had enforced a dress code that banned employees from wearing with their uniforms anything other than name badges, company approved buttons, United Way pins and service recognition pins. *Id.* at 1211.

Meijer argued that *CREP* was controlling and that the definition of "discrimination" espoused in that case was dispositive. *Id.* at 1212. This Court disagreed. It

While acknowledging that the definition of the term discrimination as set forth in *CREP* and *Sandusky* is a narrow one, the Board contends that this Court is not bound by those cases because this Court subsequently has limited their holdings to situations involving a union's economic attack against an employer, and not, as here, where the union is engaging in organizing activity. Further, the Board contends that the discussion regarding the definition of discrimination in *Sandusky* and *CREP* was merely dicta. While the Board is correct that a panel of this Court distinguished *CREP* in a case decided subsequent to *CREP*, as explained below, the distinction is not as far sweeping as the Board contends.

### B. Limitation of *CREP* and *Sandusky*

As we explained earlier, the Board's decision in this case fails to distinguish between the activity engaged in by Local 582 and Local 555. Indeed, the Board analyzed the claims regarding Local 582 (involving non-organizational boycotting activities) and Local 555 (involving organizational activity) together. The Board's decision generally held that any and all exclusion of the union from an employer's premises is discriminatory where the employer allows others, such as charities, the right to solicit on its premises. Thus, the Board determined that it did not matter whether the activities engaged in between Local 582 and Local 555 and the charities were similar or whether charities and unions are comparable groups. *But see Sandusky*, 242 F.3d at 690 (holding that the alleged discriminatory conduct in allowing solicitation by one group while barring such solicitation by another requires that the discrimination be among comparable groups or activities). It is only on appeal that the Board argues that charities and unions are indistinguishable for purposes of a discrimination analysis and that unions engaging in organizational activity specifically and charity solicitations are comparable activities. The arguments the Board now seeks to raise are clearly crafted for appeal because of our holdings in *CREP* and

---

to communicate with Albertson's employees.

"discrimination" in *Sandusky* and *CREP*, the Board argues that they are distinguishable in that those cases involved unions urging a consumer boycott and not organizing activity. In that vein, the Board has abandoned its claims as to Local 582, which undisputedly was involved in boycotting activity, and seeks enforcement of its Order only with respect to Local 555.

At the outset, we note that the Board did not rely on any distinction between organizing and boycotting activity in reaching its decision below. As explained, Local 582 clearly was engaged in boycotting activity, and the Board decided that case and the case involving Local 555 together, and applied a generally applicable rule to all such cases. According to the Board's opinion, the general rule is that "an employer . . . [that] denies a union access to its property while regularly allowing other individuals, groups, and organizations to use its premises for various activities unlawfully discriminates against the union solicitation." The Board explained that it would not allow an employer to justify the restriction of union solicitation on the grounds that it permits only charitable solicitation. *Id*. The Board explained that "where other nonemployee solicitation is frequently allowed, the fact that much of that solicitation is charitable or otherwise noncontroversial does not preclude a finding of discrimination against union solicitation." *Id*. The Board found that the solicitation permitted by Albertson's exceeded the small number of isolated beneficent acts that the Board has in the past regarded as a permissible narrow exception to an employer's general no-solicitation rule, such as the one employed by Albertson's in the instant case. The Board explained that its position was consistent with the Supreme Court's decision in *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105 (1956), in which the Court first discussed the "discrimination exception" to the general rule that employers are not bound to permit unions on their property to solicit members.

One member of the Board panel dissented. The dissenting member stated that the NLRA prohibits discrimination against

union solicitation, but that an employer may allow one type of solicitation on its property while not permitting other types of solicitation. For instance, the dissenting member stated that an employer may permit solicitations by charities for cancer while denying those by organizations that combat AIDS. The dissenting member characterized the company's policy as permitting solicitations by charitable groups well-known to the community while banning such solicitations from charitable groups that are not well known or by political groups or commercial groups selling goods and services. The dissenting member saw no problem with such a policy inasmuch as the line Albertson's drew regarding the organizations that could and could not solicit was not an anti-union line. The dissenting member reasoned that the unions in this case were not soliciting charitable contributions, but rather were attempting, among other things, to persuade the company's employees to "buy" its representational services, which the store's no-solicitation policy prohibited. The dissenting member pointed out that if one of the charities that was permitted to solicit on the company's property sought donations for a political campaign, such solicitation would be prohibited under the company's no-solicitation policy. However, if a union sought to raise money for the American Cancer Foundation, it would be permitted to do so under the policy. The dissenting member explained that such a policy was permitted under the NLRA because it was not based on union considerations. The dissenting member further believed requiring employers to open their doors to unions whenever they chose to do so for charities would lead to employers closing their doors on charities altogether, and that the Board should encourage employers to be as generous as possible in allowing access to their premises for beneficent acts.[2]

---

[2] In addition to the parties, several amici also have submitted briefs in this appeal. The amici are the Salvation Army; Bi-Mart, a local retailer; and the Campfire Boys and Girls. While the Board majority stated that there is no evidence that employers had closed their doors on charitable solicitations, several of the amici contend on appeal that this situation has occurred.

Court in *CREP* and reaffirmed in *Sandusky*, no discrimination occurred in this case.[5]

---

[5] The parties present numerous arguments pertaining to whether unions and charities are comparable for purposes of a discrimination analysis. The amici also have submitted briefs primarily addressing this same issue. Because of our disposition in this case, we need not reach the various issues raised by the amici or the parties pertaining to the similarity or dissimilarity between charities and unions. We adhere to our decision in *CREP* that "[n]o relevant labor policies are advanced by requiring employers to prohibit charitable solicitations in order to preserve the right to exclude nonemployee distribution when access to the target audience is otherwise available." 95 F.3d at 465. The Board contends, however, that despite the holdings in *CREP* and *Sandusky*, the Supreme Court's holding in *NLRB v. Stowe Spinning Co.*, 336 U.S. 226 (1949), supports the Board's view that discrimination occurs under *Babcock & Wilcox* where an employer allows access to its property to charities but denies similar access to unions. As a preliminary matter, *Stowe Spinning* was not interpreting the "discrimination exception" announced in *Babcock & Wilcox*, as *Stowe Spinning* was decided several years prior to that case. Further, *Stowe Spinning* is distinguishable on its facts. In that case, the Board found that four employers in a small town had committed an unfair labor practice where the employers had refused to allow a union to meet in the only meeting hall in the town, although the employers had allowed other groups, including some of a charitable nature, to do so. *Stowe Spinning*, 336 U.S. at 233; *see also NLRB v. Stowe Spinning Co.*, 165 F.2d 609, 610 (4th Cir. 1947) (noting that meeting hall had been used for such purposes as church banquets, Ladies Aid Society meetings, and a Christmas party for school children). However, in refusing to upset the Board's finding that the employers' actions constituted an unfair labor practice, the Supreme Court explained that there was evidence that the sole reason that the employers disallowed the union meeting was the result of anti-union bias. Several employees, for example, had been fired for their union activity and the employers, themselves, failed to dispute that they refused access of the hall to the union because of their disdain for unions. 336 U.S. at 203 & n.7. In addition, the Court emphasized that it could not compare the access to the meeting hall in the small "company-dominated" town with "the vast metropolitan centers where a number of halls are available within easy reach of prospective union members." *Id.* Thus, in addition to anti-union bias, there was evidence that there was no other reasonably available forum for the union meeting in the town. *Cf. CREP*, 95 F.3d at 463 ("Where reasonable alternative means of access exist, § 7's guarantees do not authorize trespass by nonemployee organizers, even . . . 'under . . . reasonable regulations' established by the Board.") (quoting *Lechmere*, 502 U.S. at 847-48.) In the instant case, there is no claim that Local 555 lacked other reasonable means by which

The union filed an unfair labor practice charge against Sandusky, and the Board found that Sandusky had violated the NLRA. *Id*.

On appeal, the Court addressed the specific issue of whether "Sandusky may be compelled to permit non-union employee union members to trespass on the mall's property for the purpose of distributing handbills urging mall customers not to patronize non-union employers." *Id*. Relying on *CREP*, the Court in *Sandusky* answered the question in the affirmative. *Accord Riesbeck Food Markets, Inc. v. NLRB*, No. 95-1766, 95-1917, 1996 WL 405224, at *3 (4th Cir. July 19, 1996) (holding that employer did not discriminate against union when it allowed charities on its property to solicit contributions, but would not allow non-employee union representatives to engage in "do not patronize solicitation" targeted at the employer); *NLRB v. Pay Less Drug Stores Northwest, Inc.*, No. 94-702279, 1995 WL 323832 (9th Cir. May 25, 1995) (holding that mall did not discriminate against union when it allowed Girl Scouts and bloodmobile on mall property while not allowing picketing non-employee representatives).

The holdings in *CREP* and *Sandusky* that an employer does not discriminate against a union where the employer allows charities to disseminate information on the employer's property while it bars unions from doing the same, without more, appears to foreclose the Board's argument that discrimination occurred in this case. It is uncontested that Albertson's only allowed certain charities to solicit donations around the exterior of its property, except in inclement weather when it allowed the Girl Scouts and Salvation Army bell ringers access to the inside of some its stores. There is no evidence in this case that during the time Albertson's refused to allow Local 555 non-employee organizers to distribute literature on its property, Albertson's allowed distribution by another union or that Albertson's, itself, disseminated information similar to that it banned Local 555 from disseminating. *CREP*, 95 F.3d at 465. Therefore under the definition of the term "discrimination" as set forth by this

As explained below, we believe that *Sandusky* and *CREP* control the disposition of this case. Those cases narrowly defined the term "discrimination," as the Supreme Court used that term in *Babcock & Wilcox*, and preclude a finding of a discrimination in the instant case on the company's part. Although, as the Board notes, *Sandusky* and *CREP* dealt with boycotting activity, when interpreting the term "discrimination," this Court looked to *Babcock & Wilcox* for guidance, which itself was a case that dealt with organizing activity. Thus, the Board has failed to present a reasoned basis to distinguish *Sandusky* and *CREP* from the instant case.

## II.

The parties contest the applicable standard of review. The Board argues at length that this Court must defer to its definition of the term "discrimination," because in order to reach that definition, the Board had to construe certain statutory provisions under the NLRA. *See Holly Farms Corp. v. Nat'l Labor Relations Bd.*, 517 U.S. 392, 398-99 (1996) (holding that where statute's meaning is obvious, courts and Board must defer to Congress's unambiguous intent, but where ambiguity exists, courts must defer to an agency's reasonable interpretation of the statute) (citing *Chevron v. U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984)). According to the Board, the NLRA states in general terms that an employer commits an unfair labor practice by, among other things, restraining or interfering with certain rights guaranteed by the NLRA, such as the right of employees to self-organize or to join a union. *See* 29 U.S.C. §§ 157, 158(a)(1). The Board essentially contends that because Congress has not spoken to the precise issue of when an employer "discriminates" against a union by refusing to allow non-employee union organizers to distribute union literature on its property although it allows other groups to do so, then this Court must accept the meaning that the Board attributes to the term discrimination. We disagree.

This Court has addressed and rejected a similar argument by the Board in *Sandusky*, where we reaffirmed the standard

of review applicable to Board decisions as earlier set forth by this Court in *CREP*. We pointed out in *Sandusky* that "we review the Board's factual application and statutory construction under a substantial evidence standard, a deference that is warranted if the Board's conclusions are based upon a reasonably defensible construction of the Act." 242 F.3d at 687 (quoting *CREP*, 95 F.3d at 462). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Dow Elastomers, L.L.C. v. NLRB*, --- F.3d ---, Nos. 00-2379, 01-1009, 2002 WL 1489621, at *4 (6th Cir. July 15, 2002).

However, this Court gives no deference to the Board where the Board's decision "rest[s] on erroneous legal foundations." *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 539 (1992) (holding that Board erred in finding that employer should have allowed union on its premises because it had no other way to reach its target audience, inasmuch as in reaching its decision the Board misconstrued prior Supreme Court precedent). Further, where the Board's conclusions of law do not interpret the NLRA, we review those conclusions *de novo*. *Meijer, Inc. v. NLRB*, 130 F.3d 1209 (6th Cir. 1997). In that vein, we review *de novo* the Board's interpretation of Supreme Court and Sixth Circuit decisions, and give the Board no deference "with respect to the interpretation of judicial precedent." *Sandusky*, 242 F.3d at 692; *see also NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1123 n.8 (6th Cir. 1997) (deferring to the Board's definition of "labor organization," but noting difference in deference given to Board's reasonable interpretation of the NLRA as opposed to its interpretation of Supreme Court precedent construing the Act).

In the instant case, the Board's decision turned on its finding that Albertson's discriminated against Local 555 and Local 582 by refusing to allow these two unions to distribute their literature or otherwise solicit on the premises of the company's stores while allowing certain charities to do so. The issue of whether an employer "discriminates" against a union under such circumstances is not one of first impression in this circuit, as we addressed this issue in *Sandusky* and

generally should be respectful of the Board's interpretation of the term "discrimination," this Court also explained that the Board's decision is owed no deference where it "rests on erroneous legal foundations." *Id*. In that vein, this Court held that "[n]o relevant labor policies are advanced by requiring employers to prohibit charitable solicitations in order to preserve the right to exclude nonemployee distribution of union literature when access to the target audience is otherwise available." *Id*. The Court noted that the purpose of Section 8(a)(1) of the NLRA is to prevent employers from interfering with employees' Section 7 rights. *Id*. Bearing such considerations in mind, the Court reasoned that:

> An owner of a private commercial property who permits a charitable organization to distribute information or conduct solicitations on its property simply does not implicate the policies of the NLRA and does not, without more, render an employer guilty of an unfair labor practice when later it chooses to follow the general rule of "validly post[ing its] property against nonemployee distribution of union literature."

*Id*. (citing *Babcock*, 351 U.S. at 112).

Such considerations led this Court to hold that the term discrimination, as used in *Babcock & Wilcox*, means "favoring one union over another, or allowing employer-related information while barring similar union-related information." *Id*.

In *Sandusky*, this Court again addressed the discrimination exception in *Babcock & Wilcox*. The union in *Sandusky* began a picketing campaign after a store in a mall hired a non-union construction contractor and threatened to handbill another mall tenant for the same reason. 242 F.3d at 684. Sandusky, which owned and operated the mall, notified the union that handbillers would be considered trespassers and that they would be asked to leave. *Id*. The handbillers distributed handbills in the mall on several occasions and were asked to leave each time. Finally, the mall manager called the police and had the handbillers arrested. *Id*. at 685.

retailer in the mall, while permitting non-labor related handbilling and solicitations by others in the mall without violating section 8(a)(1) of the NLRA." *Id.* at 461-62. The Court answered the question in the affirmative. *Id.* The Court held that the owner of private commercial premises may forbid handbilling by "nonemployee union organizers engaged in non-organizational, informational activity directed at the general public . . . ." *Id.* at 464. Relying on *Lechmere*, the Court held that the only exception to this rule is where the union shows that "it is entitled to trespass on the owner's private property because the inaccessibility to the general public to which the handbilling is directed makes ineffective the reasonable attempts by non-employees to communicate with [the public] through the usual channels." *Id.* (citing *Lechmere*, 502 U.S. at 537).

In *CREP*, the Board argued that *Lechmere* was not relevant inasmuch as *Lechmere* failed to analyze *Babcock & Wilcox's* discrimination exception, because CREP "discriminated against the union by permitting other solicitation by charities."[4] *Id.* at 464. This Court disagreed that *Lechmere* did not apply, but more importantly for purposes of the instant case, it held that under *Babcock & Wilcox* and its progeny, such as *Lechmere*, "which weigh heavily in favor of private property rights," the word "discrimination" does not carry the weight the Board ascribes to it. *Id.* at 465. The Court explained that "[t]o discriminate in the enforcement of [an employer's] no-solicitation policy cannot mean that an employer commits an unfair labor practice if it allows the Girl Scouts to sell cookies, but is shielded from the effect of the Act if it prohibits them from doing so." *Id.* The Court recognized that since *Babcock & Wilcox* was decided, the Supreme Court had never "clarified" the term discriminate. *Id.* Further, while this Court in *CREP* acknowledged that we

---

[4]The Court in *Lechmere* focused only on the first exception to the "general rule" that an employer "can bar nonemployee union organizers from his property," because in that case, it was undisputed that the employer had not permitted any other group to distribute literature on its property. *Lechmere*, 502 U.S. at 844 n.1.

*CREP.* Further, in reaching its decision below, the Board was interpreting "discrimination" as that term was used in the Supreme Court case *Babcock & Wilcox.* Consequently, our standard of review of the Board's interpretation of that Supreme Court authority is *de novo. Sandusky*, 242 F.3d at 692.

### III.

Section 8(a)(1) of the NLRA provides that "[i]t shall be an unfair labor practice for an employer--to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the NLRA]." 29 U.S.C. § 158(a)(1). Section 7 of the NLRA provides in pertinent part that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. An employer may therefore violate the NLRA and commit an unfair labor practice where it restrains or interferes with the right of employees to organize, pursuant to Section 7. *Lechmere,* 502 U.S. at 531-32.

"By its plain terms, thus, the NLRA confers rights only on employees, not on unions or their nonemployee organizers." *Id*. at 532. "No restriction may be placed on the employees' right to discuss self-organization *among themselves*, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline, but no such obligation is owed to nonemployee organizers." *Id*. at 533 (emphasis in the original) (quoting *NLRB v. Stowe Spinning*, Co., 336 U.S. 226, 231 (1949)). Section 7's organization rights therefore apply only "derivatively" to non-employee union organizers. *Id*. at 533; *see also Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 207 n.42 (1978) (explaining that "'no . . . obligation is owed nonemployee organizers;' any right they may have to solicit on an employer's property is a derivative of the right of that

employer's employees to exercise their organization rights effectively").

The general rule is that "an employer cannot be compelled to allow distribution of union literature by nonemployee organizers on his property." *Lechmere*, 502 U.S. at 533. However, the Supreme Court has recognized that "the right of self-organization depends in some measure on [an employer's employees'] ability . . . to learn the advantages of self-organization from others . . . ." *Id.* at 531. Therefore, Section 7 might "in certain limited circumstances, restrict an employer's right to exclude nonemployee union organizers from his property." *Id* at 532. *Lechmere* reaffirmed the Supreme Court's earlier holding that an employer may "post his property against nonemployee distribution of union literature if [1] reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and [2] if the employer's notice or order does not discriminate against the union by allowing other distribution [the 'discrimination exception']." *Babcock & Wilcox,* 351 U.S. at 112. Particularly, as to the discrimination exception, "the alleged discriminatory conduct in allowing solicitation [or] handbilling require[s] that the discrimination be among comparable groups or activities, and that the activities themselves under consideration must be comparable." *Sandusky*, 242 F.3d at 690 (citations, internal quotation marks, and alterations omitted).[3]

---

[3] The Board has held that the discrimination exception generally is subject to two exceptions of its own. An employer does not discriminate (1) if the employer allows a few isolated instances of charitable solicitation ("beneficent acts exception"); or (2) if the solicitations approved by the employer relate to the employer's business functions and purposes. *See Lucile Salter Packard Children's Hosp. at Stanford v. NLRB*, 97 F.3d 583, 587 (D.C. Cir. 1996) (citation omitted). In the instant case, the Board held that the frequency with which Albertson's allowed charities to solicit donations on its stores' premises exceeded that permitted under the beneficent-acts exception. Albertson's does not contest this finding on appeal. However, Albertson's does contend that the Board offers no reasonable justification for its beneficent-acts exception and as to why employers' property rights should be diminished

## A. *CREP* and *Sandusky* and the definition of discrimination

This Court has discussed the *Babcock & Wilcox* holding regarding discrimination in *Sandusky* and *CREP*. In *CREP*, 95 F.3d 457, the union began a handbill campaign against Marc's, a retail store and one of the tenants in a strip mall managed by CREP. *Id.* at 459. The handbills conveyed that Marc's had violated child labor laws and that worms were found in boxes of raisins the store sold. *Id.* The purpose of the handbills was to inform the public that Marc's was a non-union store and to ask the public not to shop there. *Id.* at 460. After Marc's complained to the property manager, steps were taken to have the handbillers cease their boycotting activities. Eventually, the property manager called the police one day when the handbillers had refused to leave, because they were in violation of the city ordinance against loitering. *Id.* at 461.

The union filed an unfair labor practices charge against CREP, and an ALJ found that in the past, the Salvation Army had been allowed to distribute leaflets on windshields of cars parked at the mall. The ALJ further found that political candidates had been allowed to solicit signatures and the Girl Scouts had sold cookies. Other groups allowed to solicit without being asked to leave included the Knights of Columbus, the Boy Scouts, veterans, and school children selling candy for various school projects. *Id.* The ALJ found that the union organizers were engaged in a protected activity under the NLRA and found it irrelevant that the handbillers were not employed by Marc's inasmuch as they were employees of other unionized stores at the mall. *Id.*

This Court framed the issue as follows: "[W]hether the owner of a private retail shopping mall may forbid union representatives from distributing handbills directed at shoppers to discourage them from patronizing a non-union

---

as a result of their generosity to charities. As for the second exception, Albertson's does not contend that the charitable solicitations it allowed on its premises relate to its business as a retail grocer.